**In the Interest of M.S., E.S., D.S., S.S., and N.S., Minor Children.**

No. 02–0509.

Supreme Court of Texas.

Argued Feb. 12, 2003.

Decided July 3, 2003.

Rehearing Denied Oct. 17, 2003.

Michael D. Papania, Law Firm of James A. Delee, Port Arthur, Jess Williams, Beaumont, for Petitioner.

Duke Elton Hooten, Austin, Randi A. Monzingo King, Beaumont, C. Ed Davis, Phoebe Ellis Knauer, Austin, Sarah Regina Guidry, Houston, and Cathy Ann Morris, Austin, for Respondent.

Justice ENOCH delivered the opinion of the Court.

This is a parental rights termination case. Shana Strickland had five sons. In December 2000, following a jury trial, her parental rights were terminated. The jury considered five grounds for termination: endangerment by conditions or surroundings;[1] conduct endangerment;[2] constructive abandonment;[3] failure to comply with a court order;[4] and failure to submit to a court order.[5] The jury was also asked to consider the best interest of the children.[6] The jury found at least one ground supported termination, and that termination was in the best interest of the children. The trial court rendered judgment on the verdict.

Having lost also in the court of appeals, Strickland appeals to this Court, raising

---

1. TEX. FAM.CODE § 161.001(1)(D).

2. *Id.* § 161.001(1)(E).

3. *Id.* § 161.001(1)(N).

4. *Id.* § 161.001(1)(O).

5. *Id.* § 161.001(1)(I).

6. *Id.* § 161.001(2).

four issues. First, she complains that the trial judge erred in admitting into evidence previously rendered orders in which he found certain facts to exist. Strickland asserts that this conduct amounts to impermissible testimony by the trial judge in violation of Texas Rule of Evidence 605. Second, Strickland complains that the trial judge erred in admitting into evidence a Memorandum of Agreement, signed after court-ordered mediation, because that too amounted to impermissible testimony by the trial judge in violation of Rule 605. As well, Strickland complains that the Agreement constitutes inadmissible hearsay under Texas Rule of Evidence 802, and its admission violates alternative dispute resolution procedures mandating confidentiality under Texas Civil Practice and Remedies Code section 154.073 (the "ADR statute"). Third, Strickland complains that the court of appeals erred in refusing to consider her factual sufficiency complaint, though the complaint was not preserved in the trial court. And finally, Strickland insists that because she has a statutory right to legal counsel in her termination proceedings,[7] she also has a right to effective assistance of counsel. Thus, she complains about her trial counsel's failure to ensure that voir dire, the charge conference, and closing arguments were recorded, his failure to preserve her factual sufficiency complaint, and his failure to file alternative pleadings allowing for the possibility of a less drastic outcome than outright termination. Those failures, she asserts, amounted to ineffective assistance of counsel, entitling her to a new trial.

We conclude that admitting the orders without redacting the judge's fact-findings was error, but we also conclude that the error was harmless and did not result in the rendition of an improper judgment. Further, we hold that admitting the Memorandum of Agreement did not violate either Rule 605 or Rule 802, or the confidentiality provision of the ADR statute. Regarding Strickland's factual sufficiency complaint, and because the complaint was not preserved for review as otherwise required by our rules of procedure,[8] we consider this issue in conjunction with her complaint that her appointed counsel was ineffective. On that point, we hold that Strickland was entitled to effective assistance of counsel. Specifically, we hold that counsel's failure to ensure that the entire proceedings were recorded by the court reporter did not amount to ineffective assistance. But counsel's failure to preserve Strickland's factual sufficiency complaint could, under some circumstances, constitute ineffective assistance. Consequently, we remand that portion of the case to the court of appeals to determine whether Strickland was harmed by her counsel's failure to preserve that error.

## I. Evidentiary Points

### A. Admitting Orders Containing Fact Findings

■ On June 24, 1999, the trial court issued a Temporary Order Following Adversary Hearing.[9] That order included these findings:

3.1 The Court finds there is sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the child(ren) which was caused by an act or failure to act of the person entitled to possession and for the child(ren) to remain in the home is contrary to

---

7. *Id.* § 107.013(a)(1).

8. *See* Tex.R. Civ. P. 324(b)(2).

9. *See* Tex. Fam.Code §§ 262.201–.205.

the welfare of the child(ren); (2) the urgent need for protection required the immediate removal of the child(ren) and makes efforts to eliminate or prevent the child(ren)'s removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the child(ren)'s removal and enable the child(ren) to return home, there is a substantial risk of a continuing danger if the child(ren) [is/are] returned home.

3.2 The Court finds sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child(ren) and for the child(ren) to remain in the home is contrary to the welfare of the child(ren).

3.3 The Court finds that all reasonable efforts consistent with time and circumstances and pursuant to 42 U.S.C. Sections 671(a)(15) and 672(a)(1) have been made by the [Texas Department of Protective and Regulatory Services] to prevent or eliminate the need for removal of the child(ren) from the home and to make it possible for the child(ren) to return home, but it is not in the child(ren)'s best interest to remain at home.

3.4 The Court finds that the placement of the child(ren) with the child(ren)'s noncustodial parent or with a relative of the child(ren) is inappropriate and not in the best interest of the child(ren).

3.6 [sic] The Court finds that the following orders for the safety and welfare of the child(ren) are in the best interest of the child(ren).

On April 6, 2000, the trial court issued an order based on a permanency hearing.[10] In that order, the trial court concluded:

2.6 The Court finds that neither the child(ren)'s parent(s) nor any other person or entity entitled to service under Chapter 102, Tex. Fam. Code, is willing and able to provide the child(ren) with a safe environment and; therefore, return of the child(ren) to a parent or other person or entity is not in the child(ren)'s best interest. . . .

During the subsequent termination proceeding, the Texas Department of Protective and Regulatory Services (the "Department") offered both orders into evidence over Strickland's objection. The trial judge overruled the objection and admitted the orders, along with the service plans submitted by the Department at those earlier hearings. The Department relied on the orders and service plans to show what Strickland had been ordered to do to retain custody of her children, and that she had not complied.

The judge presiding at the termination proceeding was the same judge that presided over the earlier hearings and signed the orders admitted into evidence in the termination hearing. Strickland complains that admitting the orders violated Texas Rule of Evidence 605, which states that "[t]he judge presiding at the trial may not testify in that trial as a witness."[11] Though Strickland's counsel objected to the admission of the orders, apparently on best evidence grounds, he did not specifically object under Rule 605. But Rule 605

---

**10.** *See id.* §§ 263.301–.307.

**11.** Tex.R. Evid. 605.

states: "No objection need be made in order to preserve the point."[12]

A judge's findings of fact are not technically the same as testimony. A "finding of fact" is "[a] determination by a judge ... of a fact supported by the evidence in the record."[13] In this case, the orders submitted into evidence, containing findings based on pretrial evidence by the very judge presiding over the termination proceeding, could be, like a judicial comment on the weight of the evidence, a form of judicial influence no less proscribed than judicial testimony. "[O]ur statutes, court-made rules, and judicial decisions emphatically and repeatedly prohibit Texas judges from commenting on the weight of the evidence."[14] A comment on the weight of the evidence may take many forms,[15] but this Court specifically prohibits judicial comments that "indicate the opinion of the trial judge as to the verity or accuracy of the facts in inquiry."[16] Here, the jury was permitted to see findings of fact made by the very judge presiding over the trial, and those facts were the very ones that the jury itself was being asked to find. The fact-finding present in the orders admitted as evidence comes far too close to "indicat[ing] the opinion of the trial judge as to the verity or accuracy of the facts in inquiry"[17] for any comfort here.

To be clear, admitting the orders as evidence in support of the Department's position that Strickland failed to comply with the orders of a court was not in itself inappropriate. However, the trial judge's factual findings that his order had, in fact, been violated, should have been redacted, so that the jury could draw its own conclusions as to whether Strickland had complied.

Strickland did not object to the admission of the orders into evidence on this basis, but only on "best evidence" grounds. But even had Strickland properly objected and preserved the error, the error was not harmful and thus would not be reversible error.[18] In cases where the error complained of involves an evidentiary ruling, the reviewing court examines the whole record to determine if the complaining party was harmed by the erroneous admission or exclusion.[19] It was Strickland's burden to show that she was prejudiced by the admitted orders.[20] First, Strickland fails to point out how she was harmed by the admission of the judge's findings. Second, there is nothing in the record showing that the Department specifically based any of its arguments on the trial court's fact-findings, or that the Department even pointed out the findings to the jury for its particular consideration. Finally, there was ample other evidence that Strickland

---

12. *Id.*

13. BLACK'S LAW DICTIONARY 646 (7th ed.1999).

14. *In re T.T. & K.T.,* 39 S.W.3d 355, 359 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (citing TEX.CRIM. PROC.CODE art. 36.14, TEX.R. CIV. P. 277, and *Blue v. State,* 41 S.W.3d 129, 132 (Tex.Crim.App.2000)).

15. *McDonald Transit, Inc. v. Moore,* 565 S.W.2d 43, 45 (Tex.1978); *Bott v. Bott,* 962 S.W.2d 626, 631 (Tex.App.-Houston [14th Dist.] 1997, no pet.); *Pitt v. Bradford Farms,* 843 S.W.2d 705, 707 (Tex.App.-Corpus Christi 1992, no writ).

16. *McDonald Transit, Inc.,* 565 S.W.2d at 45.

17. *Id.*

18. *See* TEX.R.APP. P. 44.1(a)(1).

19. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995); *King v. Skelly,* 452 S.W.2d 691, 696 (Tex.1970); *Tex. Power & Light Co. v. Hering,* 148 Tex. 350, 224 S.W.2d 191, 192 (1949).

20. *See Alvarado,* 897 S.W.2d at 753–54.

did not comply with the trial court's orders.

For example, there were a total of six family service plans. The first was established in September 1998. At that time, Strickland's goals were to find an appropriate home for herself and her children, provide consistent and appropriate supervision for her children, obtain employment, and attend counseling. In April 1999, the Department established a Child Safety and Evaluation Plan, which required Strickland to cooperate with Child Protective Services ("CPS"), and to provide appropriate supervision for her children. Another service plan was proposed in May 1999; the record does not contain a copy of the plan itself, only the plan coversheet.

After the children were removed from Strickland, another plan, established in July 1999, set out the following tasks Strickland had to accomplish in order to be reunified with her children: (1) find employment and pay child support; (2) participate in paternity testing; (3) form "healthy and supportive relationships with adults that are beneficial to the family;" (4) abstain from drug use, and show her compliance with this task by submitting to drug tests; (5) take parenting classes; (6) submit herself to psychological evaluation, cooperate in the evaluation sessions, and follow all recommendations made by the psychologist; and (7) attend individual counseling at least twice a month.

The plan in effect when the trial judge held the Permanency Hearing had been established in November 1999. That plan required Strickland to cooperate with random drug screening, attend parenting classes, participate in counseling, provide a Health, Social, Educational and Genetic History for each child, find stable employment, find stable housing, and pay child support. In the caseworker's progress report, the caseworker indicated that Strickland failed several drug tests, and had thus far refused treatment for drug dependency. The caseworker noted that Strickland had been referred to the Texas Rehabilitation Commission for employment training, but that she did not follow up with the Commission after her initial appointment. The caseworker concluded that Strickland had not yet "made enough progress toward alleviating or mitigating the causes for her children's removal from her care."

Yet another plan, established in March 2000, required Strickland to submit to drug testing, and to attend parenting classes, psychological evaluation, and counseling. It also required that Strickland find stable employment. The progress notes pertaining to that plan indicated that Strickland had still not satisfactorily resolved any of the problems that had caused the removal of her children. The report stated:

> She has been unable to retain stable employment so that she could secure her own housing and pay her court-ordered child support. She has made no child support payments thus far. She was arrested on January 26, 2000 for seven warrants. She made payment arrangements and her warrants were taken out of her records. Ms. Strickland was released on January 28, 2000.

In July 2000, a final plan called for Strickland to find stable employment and stable housing, pay child support, receive counseling, and continue to submit herself for drug testing. The caseworker's notes reported that Strickland's progress was still unsatisfactory. The report indicated that Strickland had not established stable housing, and that she was driving with an expired driver's license. The report stated that even though Strickland's children had been removed, she had continued to receive child support payments from the father of one of the boys, an amount totaling

three thousand dollars, but that she still had not made any child support payments to the Department. Copies of the plans and the three progress reports were published to the jury.

Additionally, the jury heard testimony from several people who had been involved in the case at different stages. Jill Badeaux had provided daycare for Strickland's five children before the children were removed from Strickland. Badeaux testified that the children's attendance at daycare was inconsistent, and that Strickland paid for the daycare services sporadically. She testified that two of the boys had particular behavioral problems, one with anger, the other with separation anxiety. She testified about burns on three of the boys. She testified as to the severity of the youngest boy's diaper rash, and stated that while Strickland did provide medication for the rash one time, Badeaux herself purchased medication to treat the rash. Badeaux also said that she had to purchase formula for the baby because Strickland sent him to daycare with only a bottle of Kool–Aid. Badeaux often purchased clothes and shoes for the boys. Badeaux testified that she would often take the boys home around six-thirty p.m., because if she did not, then Strickland would leave the boys at daycare until eight o'clock at night, even if Strickland was not at work. Badeaux also testified that on the occasions she had to bring the boys home, she would see teenagers hanging around Strickland's home. Badeaux said that she thought that the presence of the teenagers prevented Strickland from giving her own children enough time and attention, and that she had spoken to Strickland about it on several occasions. She also testified that many times when she was at Strickland's house, the children were outside alone and unsupervised.

The CPS caseworker who first assisted Strickland, Debbie Dugas, also testified that Strickland often left her children in daycare until very late, sometimes eight o'clock at night. Dugas testified as to various injuries sustained by the children. Three of the children had suffered first- and second-degree burns, one had sustained a dislocated shoulder, another a cracked kneecap; the youngest boy suffered from severe diaper rash and, at one time, had a black eye. Dugas testified that she had referred Strickland for a psychological evaluation, but that Strickland never went. When asked whether Strickland had complied with the requirement that she participate in counseling, Dugas responded that Strickland attended counseling at first, but then "ended up not making appointments." Dugas testified that Strickland held at least three different jobs while Dugas was handling the case, but that none of those jobs lasted very long.

The jury also heard testimony from Sherry Tucker, a CPS investigator. Tucker testified about the burn injuries on the children, and as to the severity of the infant's diaper rash, which by that time had actually become genital fungus. She also testified as to the condition of Strickland's mobile home, which had a broken window, and two broken door latches (one of which was the front door). She testified that the children were using a fork to open the front door, and that it took as long as one minute to get the door open using the fork, which constituted a significant safety hazard. She also observed that much of the trailer's siding was either rotted or missing. She told the jury that at the time of her visit, there were four or five teenagers present in the home who were not related to Strickland.

The jury also heard testimony from Yoshi Bennett, a CPS foster care worker.

At the time of the trial, Bennett had worked with Strickland and the children for 18 months, attempting to help Strickland set and meet goals in order to reunify the family. Bennett testified that Strickland had not maintained steady employment throughout the pendency of the case, and had never paid any child support for the children since the time they were removed from her. Bennett also testified that Strickland had not been able to obtain reliable transportation, and that Strickland never complied with the paternity test requirement. Bennett testified that though Strickland was supposed to form healthy relationships with other adults, she continued to associate mostly with teenagers. Bennett stated that Strickland was supposed to find a suitable home for herself, but up until at least five or six weeks before the trial, Strickland still lived in an apartment with an eighteen-year-old. Bennett attested that Strickland only sporadically complied with drug-testing requirements, with some test results registering positive for drugs. Bennett testified, however, that Strickland did eventually successfully complete rehabilitation, and did not thereafter test positive for drugs. Bennett testified that Strickland attended required counseling sessions at first, but then her attendance dropped off, so that the program finally had to be cancelled. Bennett also testified that although Strickland was permitted weekly supervised visitation with her children, so long as she complied with the drug testing schedule, her visits were as infrequent as once a month or less. Strickland also attempted to see the children at other times without properly setting up a visitation appointment.

The jury heard testimony from Karen Martinez, a CPS investigator who had also worked on Strickland's case. Martinez testified that she had investigated allegations of neglectful supervision, because someone had called to report that two of the boys were riding Big Wheel toys in the street unsupervised. Martinez also related that one day while she was out driving, she saw one of Strickland's children, unsupervised and unattended, crossing back and forth over the intersection of a busy street. Martinez testified that she returned the child to his home and spoke with Strickland about the incident.

There was also testimony from Nathan Cormie, a therapist who worked with the children. Cormie testified that when he first started seeing the children, after their removal from Strickland, he treated them for neglect issues, separation issues, anger management, peer relationships, depression, and self-esteem. Cormie testified that since the children had been away from their mother, they appeared happy and were doing very well in school.

Pat Coyt, one of the foster parents, was also called as a witness. She testified that she first started taking care of one of the boys when he was about eight years old. She told the jury that the boy would hide when he was scared or depressed, that he could neither read nor write, that he was incontinent, and that he was unfamiliar with personal hygiene. Coyt testified that after a year and a half in her care, the boy was happier, better adjusted, was better able to take personal care of himself, and was doing well in school—so well, in fact, that he was making the A–B honor roll.

The jury also had the opportunity to listen to Strickland's testimony. Strickland testified that she understood her children were removed because she had neglected them. She testified that she had not seen her children very much after they were removed from her, and that she had been "going through rehab, going through parenting classes, trying to get my life together." She acknowledged that she

was not employed at the time, and that she had been through several jobs and had been terminated for various reasons. She admitted that she had not paid any child support, as ordered by the court, and that she had used some of the money she was supposed to pay for child support to purchase illegal drugs. She also testified that she had not found child care for her children. When asked whether she had yet found suitable housing for herself, Strickland stated that she was living with a roommate, a nineteen-year-old girl, in an apartment, and that she had attempted to find suitable housing. She testified that she had finally found a three-bedroom house to rent, and that it needed some work and to be inspected, and then she could move in. Strickland reported that she had taken a test for a job, had scored a one hundred on the test, but had not yet found out whether she got the job. She indicated that she loved her children, and wanted her family to be reunited.

Given this record, Strickland failed to show that but for the admission of the orders into evidence, the jury would have reached a different conclusion.[21] We therefore conclude Strickland was not harmed. Her first issue is overruled.

### B. Admitting the Memorandum of Agreement

■ On November 8, 2000, Strickland and CPS signed a Memorandum of Agreement. The Agreement required Strickland to: (1) find suitable housing with three bedrooms and working utilities; (2) appropriately furnish the house; (3) establish appropriate daycare for the children; (4) maintain employment; (5) apply for all available benefits for the children; (6) undergo random drug and alcohol screens; and (7) make appointments for family and individual counseling and attend each appointment. The Agreement also required that Strickland comply with all obligations under the service plans in effect. The Agreement stated that if Strickland complied with all of the requirements, then her children would be returned to her. A paragraph on the first page of the Agreement reads:

> PURSUANT TO SECTION 154.071, TEXAS CIVIL PRACTICE AND REMEDIES CODE; RULE 11, TEXAS RULES OF CIVIL PROCEDURE; AND SECTION 153.0071 TEXAS FAMILY CODE, THE PARTIES HAVE AGREED TO THE TERMS AND CONDITIONS CONTAINED HEREIN (AS INDICATED BY THE APPLICABLE SECTIONS WHICH ARE MARKED BELOW) AND, AS FURTHER EVIDENCED BY THEIR SIGNATURES APPEARING BELOW. THEY HAVE FURTHER AGREED THAT THIS MEMORANDUM SHALL BECOME BINDING UPON THE PARTIES WHEN IT HAS BEEN SIGNED BY ALL PARTIES TO THE AGREEMENT AND THEIR RESPECTIVE ATTORNEY [sic].

The Agreement contains another paragraph, which reads:

> NOTICE IS HEREBY GIVEN THAT THE ABOVE TERMS AND CONDITIONS HAVE BEEN AGREED TO BY THE UNDERSIGNED PARTIES AND CONSTITUTE A BINDING AGREEMENT PURSUANT TO RULE 11 OF THE TEXAS RULES OF CIVIL PROCEDURE. THIS AGREEMENT SHALL BE REDUCED TO WRITING OR ATTACHED AS AN EXHIBIT TO AN ORDER TO BE PRESENTED TO THE PRESIDING JUDGE WITHIN

---

**21.** *Bradley v. State*, 990 S.W.2d 245, 250 (Tex. 1999); *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 841 (Tex.1979); *King*, 452 S.W.2d at 696.

SEVEN (7) DAYS OF THIS AGREE-MENT FOR APPROVAL BY THE COURT. THE COURT MAY RE-VOKE AND/OR ALTER THE AGREEMENT ONLY WITH A DE-TERMINATION THAT IT IS NOT IN THE BEST INTEREST OF THE CHILD(REN).

On November 13, 2000, the Agreement was signed by the judge, and entered in the court records.

A copy of this Agreement was admitted into evidence at the termination hearing, over Strickland's objections. Strickland claims that admitting the Agreement into evidence violates Texas Rules of Evidence 605 and 802, and the confidentiality provision of the ADR statute. These claims are without merit. This Agreement did not contain fact-findings by the judge—or any fact-findings at all. It merely listed the actions Strickland was required to take in order to have her children returned to her. The Agreement does not amount to judicial testimony, and therefore its admission does not violate Rule 605.

Neither does the Agreement's admission violate Rule 802. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[22] Here, the Agreement was not offered as proof of Strickland's inability to care for her children, or as proof that her parental rights should be terminated, or as proof that termination was in the children's best interest. Rather, the Agreement was offered to show that an agreement had been made and what its terms were. The Agreement was not hearsay.

Nor does the Agreement violate the confidentiality provisions of the ADR statute. Texas Civil Practice and Remedies Code section 154.073 states that "a communication relating to the subject matter of any civil or criminal dispute made by a participant in an alternative dispute resolution procedure ... is confidential, is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding."[23] The Agreement, however, was not a "communication," but rather an agreement between the parties. In fact, the Agreement clearly stated in two places that it was subject to Texas Rule of Civil Procedure 11. "Rule 11 of our rules of civil procedure requires agreements between attorneys or parties concerning a pending suit to be in writing, signed and filed in the record of the cause to be enforceable."[24] Additionally, the Agreement specifically noted that it could be attached to an order of the court as an exhibit. The Agreement was not a confidential communication protected by section 154.073. Strickland's second point is overruled.

## II. Ineffective Assistance of Counsel

Strickland alleges that her attorney failed to provide competent representation both during and after the termination proceedings, in violation of her right to due process of law. Specifically, Strickland complains that her attorney failed to ensure that a complete record was made during significant parts of the parental-rights termination proceeding, such as voir dire, the jury charge conference, and closing argument. She further complains that counsel was ineffective because he failed to preserve legal and factual sufficiency points of error by neglecting to file the

---

22. Tex.R. Evid. 801(d).

23. Tex. Civ. Prac. & Rem.Code § 154.073(a).

24. *London Mkt. Cos. v. Schattman,* 811 S.W.2d 550, 552 (Tex.1991); *see also* Tex.R. Civ. P. 11.

appropriate motions during and after trial.[25]

In Texas, there is a statutory right to counsel for indigent persons in parental-rights termination cases.[26] The courts of appeals, however, disagree over whether that statutory right carries an implicit requirement that counsel's assistance be competent and effective.[27] And this Court has only tangentially discussed whether a parent has a right to competent legal assistance in a parental-rights termination proceeding.[28] But we believe that "[i]t would seem a useless gesture on the one hand to recognize the importance of counsel in termination proceedings, as evidenced by the statutory right to appointed counsel, and, on the other hand, not require that counsel perform effectively." [29]

We hold that the statutory right to counsel in parental-rights termination cases embodies the right to effective counsel. We thus align Texas with most of the other states that provide a similar right.[30]

Having held that there is a right to effective assistance of counsel in parental-rights termination proceedings, we must now address what constitutes ineffective assistance. In the majority of the states which provide a statutory right to counsel in parental-rights termination cases, courts have decided that the appropriate standard for determining whether counsel is effective should be the same as the standard applied in criminal cases.[31] Most of those courts have adopted either the standard set forth by the United States Supreme Court in *Strickland v. Washington*,[32] or one substantially similar. As one

**25.** *See* Tex.R. Civ. P. 324(b)(2); *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991).

**26.** Tex. Fam.Code § 107.013(a)(1).

**27.** *See In re K.L.*, 91 S.W.3d 1, 11 (Tex.App.-Fort Worth 2002, no pet.); *In re B.L.D.*, 56 S.W.3d 203, 211–12 (Tex.App.-Waco 2001), *rev'd on other grounds*, 113 S.W.3d 340, 2003 WL 21512622 (Tex.2003); *In re J.M.S.*, 43 S.W.3d 60, 63 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *In re B.B.*, 971 S.W.2d 160, 172 (Tex.App.-Beaumont 1998, pet. denied); *Arteaga v. Tex. Dep't of Protective & Regulatory Servs.*, 924 S.W.2d 756, 762 (Tex.App.-Austin 1996, writ denied); *In re J.F.*, 888 S.W.2d 140, 143 (Tex.App.-Tyler 1994, no writ); *Posner v. Dallas County Child Welfare Unit*, 784 S.W.2d 585, 588 (Tex.App.-Eastland 1990, writ denied); *Howell v. Dallas County Child Welfare Unit*, 710 S.W.2d 729, 734–35 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

**28.** *See In re J.F.C.*, 96 S.W.3d 256, 279–84 (Tex.2002).

**29.** *In re K.L.*, 91 S.W.3d at 13.

**30.** *See, e.g., Ex parte E.D.*, 777 So.2d 113, 115 (Ala.2000); *State v. Anonymous*, 179 Conn. 155, 425 A.2d 939, 942–43 (1979); *In re D.W.*, 385 N.W.2d 570, 579 (1986); *In re Stephen*, 401 Mass. 144, 514 N.E.2d 1087, 1090–91 (1987); *In re Trowbridge*, 155 Mich.App. 785, 401 N.W.2d 65, 66 (1986); *In re G.L.H.*, 614 N.W.2d 718, 720 (Minn.2000); *In re D.D.F.*, 801 P.2d 703, 706–07 (Okla.1990); *In re Geist*, 310 Or. 176, 796 P.2d 1193, 1201 n. 12 (1990); *In re E.H.*, 880 P.2d 11, 13 (Utah Ct.App.1994).

**31.** *In re V.M.R.*, 768 P.2d 1268, 1270 (Colo.Ct. App.1989); *Anonymous*, 425 A.2d at 943; *L.W. v. Dep't of Children & Families*, 812 So.2d 551, 556 (Fla.Dist.Ct.App.2002); *In re A.H.P.*, 232 Ga.App. 330, 500 S.E.2d 418, 421–22 (1998); *In re R.G.*, 165 Ill.App.3d 112, 116 Ill.Dec. 69, 518 N.E.2d 691, 700–01 (1988); *In re the Involuntary Termination of Parent–Child Relationship of J.T., et al.*, 740 N.E.2d 1261, 1265 (Ind.Ct.App.2000); *In re J.P.B.*, 419 N.W.2d 387, 390 (Iowa 1988); *In re Rushing*, 9 Kan.App.2d 541, 684 P.2d 445, 449–50 (1984); *In re Stephen*, 514 N.E.2d at 1091; *In re Trowbridge*, 401 N.W.2d at 66; *In re J.K.*, 236 N.J.Super. 243, 565 A.2d 706, 712–13 (1989); *In re Bishop*, 92 N.C.App. 662, 375 S.E.2d 676, 679 (1989); *Jones v. Lucas County Children Servs. Bd.*, 46 Ohio App.3d 85, 546 N.E.2d 471, 473 (1988); *In re K.L.C.*, 12 P.3d 478, 480–81 (Okla.Civ.App. 2000); *In re E.H.*, 880 P.2d at 13.

**32.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

court stated, "[b]ecause the *Strickland* standard is well-established and fairly straightforward and places a sufficiently high burden on the movant to prove ineffective assistance of counsel, we conclude that it is the standard that should apply in dependency cases such as this."[33] Our own Court of Criminal Appeals has applied the *Strickland* test in the criminal context.[34] And we see no reason not to apply it in our civil parental-rights termination proceedings.

In *Strickland,* the United States Supreme Court said:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[35]

Under *Strickland,* the defendant, to establish an ineffective assistance claim, must successfully show both prongs of the inquiry.

▇▇▇ With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a "reasonably effective" manner.[36] The Court of Criminal Appeals explained that counsel's performance falls below acceptable levels of performance when the "representation is so grossly deficient as to render proceedings fundamentally unfair. . . ."[37] In this process, we must give great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," including the possibility that counsel's actions are strategic.[38] It is only when "the conduct was so outrageous that no competent attorney would have engaged in it," that the challenged conduct will constitute ineffective assistance.[39]

▇▇ With the *Strickland* guidelines in mind, we consider Shana Strickland's complaints about her attorney's conduct. First, she cites her attorney's failure to ensure that a stenographic record was made for portions of her trial—voir dire, the jury charge conference, and closing argument. Texas Rule of Appellate Procedure 13.1 requires the presence of a court reporter, "unless excused by agreement of the parties."[40] The record here does not indicate that the parties agreed to the absence of the court reporter, but neither does Strickland contend that either party objected to the court reporter's absence.

Strickland claims that she was harmed by her counsel's failure to have a record

**33.** *L.W.,* 812 So.2d at 556.

**34.** *See, e.g., Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001); *Thompson v. State,* 9 S.W.3d 808, 812–13 (Tex.Crim.App.1999).

**35.** *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

**36.** See *id.*

**37.** *Brewer v. State,* 649 S.W.2d 628, 630 (Tex. Crim.App.1983).

**38.** *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Garcia,* 57 S.W.3d at 440–41; *Gamble v. State,* 916 S.W.2d 92, 93 (Tex.App.-Houston [1st Dist.] 1996, no pet.).

**39.** *Garcia,* 57 S.W.3d at 440; *Thompson,* 9 S.W.3d at 813.

**40.** TEX.R.APP. P. 13.1(a).

made of the voir dire, charge conference, and closing arguments because that failure increased her already heavy burden to prove ineffectiveness. That is to say, she now has no evidence of any mistakes her trial counsel might have made. In essence, Strickland complains that because she cannot show harm, she was harmed. True, this Court—or any appellate court—may only consider the record presented to it, and we cannot speculate on what might or might not be in the missing portions of the record.[41] And "[t]he appellate court must presume that the partial reporter's record designated by the parties constitutes the entire record for purposes of reviewing the stated points or issues."[42] But Strickland must at least indicate what errors would have been recorded if a record had been made. This she does not do.

Counsel's failure to ensure recording of voir dire, the charge conference, and closing arguments does not constitute ineffective assistance of counsel without a showing of harm, and Strickland has not shown that she was harmed by the lack of a complete record. We therefore hold that counsel's failure, in this case, to ensure that the entire proceedings were recorded does not constitute ineffective assistance of counsel.

■ Strickland also maintains that her trial counsel failed to file a motion for new trial, and thus failed to preserve the factual sufficiency point for review. As a result, the court of appeals refused to consider her factual sufficiency complaint. The attorney's failure to preserve a factual sufficiency complaint for appellate review, Strickland contends, harmed her.

In *In re J.F.C.*, a recent parental-rights termination case, we conducted a due process analysis of our rule of civil procedure which permits a deemed finding if an element in the jury charge is omitted.[43] Today, in *In re B.L.D.*, also a parental-rights termination case, we determined whether our preservation rules violate due process when counsel fails to object to error in the jury charge.[44] In both of those cases, we held that due process considerations did not require us to set aside our procedural rules.[45]

But in *In re B.L.D.*, we further suggested that the failure to preserve a factual sufficiency question may very well rise to the level of a due process violation because "a different calibration of the [*Mathews v.] Eldridge* factors could require a court of appeals to review an unpreserved complaint of error to ensure that our procedures comport with due process."[46] We are also mindful of the unique jurisdictional limitation on this Court's authority to review factual sufficiency complaints.[47] And finally, because Texas provides the right of an appeal from a judgment on parental-rights termination,[48] part of the process of ensuring the accuracy of judgments necessarily involves appellate review. The Supreme Court has stated that if appellate review is permitted, it must be

---

41. *See Wills v. State,* 867 S.W.2d 852, 857 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd); *Gamble,* 916 S.W.2d at 93.

42. Tex.R.App. P. 34.6(c)(4).

43. *In re J.F.C.,* 96 S.W.3d at 272–74; Tex.R. Civ. P. 279.

44. *In re B.L.D.,* 56 S.W.3d at 218; Tex.R. Civ. P. 274; Tex.R.App. P. 33.1(a)(1).

45. *See In re B.L.D.,* 56 S.W.3d at 217; *In re J.F.C.,* 96 S.W.3d at 272–74.

46. *In re B.L.D.,* 56 S.W.3d at 210.

47. *In re C.H.,* 89 S.W.3d 17, 28 (Tex.2002); *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

48. Tex. Fam.Code § 109.002(b).

allowed. " 'This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts.' "[49] Thus, error preservation in the trial court, which is a threshold to appellate review, necessarily must be viewed through the due process prism. In this context, we review our rule governing preservation of a complaint of factual sufficiency[50] under the procedural due process analysis established by *Mathews v. Eldridge*.[51]

Texas Rule of Civil Procedure 324 requires a motion for new trial to preserve "[a] complaint of factual sufficiency of the evidence to support a jury finding."[52] In conducting an *Eldridge* due process analysis, we weigh three factors—the private interests at stake, the government's interest in the proceeding, and the risk of erroneous deprivation of parental rights[53]—and balance the net result against the presumption that our procedural rule comports with constitutional due process requirements.[54]

Concerning the private interests, the Supreme Court has acknowledged that the right of a parent to maintain custody of and raise his or her child "is an interest far more precious than any property right."[55] This Court, as well, recognizes that a parent's interest in maintaining custody of and raising his or her child is paramount.[56] Thus, "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one."[57] Consideration of the private interest factor cannot be limited to only the parent's interest.[58] The child bears a substantial interest in the proceedings as well.[59] Indeed, the Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest.[60] Those interests, some of which the child shares with the parent, and some of which the child shares with the State, must necessarily be considered in this analysis.

Both the parent and the child have a substantial interest in the accuracy and justice of a decision. These consider-

**49.** *M.L.B. v. S.L.J.*, 519 U.S. 102, 111, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966)).

**50.** Tex.R. Civ. P. 324(b)(2).

**51.** 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Santosky v. Kramer*, 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

**52.** Tex.R. Civ. P. 324(b)(2); *Cecil*, 804 S.W.2d at 510.

**53.** *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

**54.** *Lassiter*, 452 U.S. at 27, 101 S.Ct. 2153; *In re B.L.D.*, 56 S.W.3d at 218; *Whitworth v. Bynum*, 699 S.W.2d 194, 197 (Tex.1985).

**55.** *Santosky*, 455 U.S. at 758–59, 102 S.Ct. 1388.

**56.** *In re J.F.C.*, 96 S.W.3d at 273; *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985); *In re G.M.*, 596 S.W.2d 846, 846 (Tex.1980).

**57.** *Lassiter*, 452 U.S. at 27, 101 S.Ct. 2153.

**58.** *In re J.F.C.*, 96 S.W.3d at 304 (Schneider, J., dissenting).

**59.** *See id.*; *see also Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 21–22 (1st Cir.2001); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997); *Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994).

**60.** *See, e.g.*, Tex. Fam.Code §§ 153.002, 161.001(2), 263.306(4), (5).

ations—the parent's fundamental liberty interest in maintaining custody and control of his or her child, the risk of permanent loss of the parent-child relationship, and the parent's and child's interest in a just and accurate decision—weigh heavily in favor of permitting a factual sufficiency review when counsel has unjustifiably failed to preserve a factual sufficiency error.

■ The State's fundamental interest in parental-rights termination cases is to protect the best interest of the child.[61] This interest is aligned with another of the child's interests—an interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged.[62] "Indeed, the U.S. Supreme Court has recognized that prolonged termination proceedings can have psychological effects on a child of such magnitude that time is of the essence...."[63] And the Family Code has a protective provision built in, one which requires prompt action on the part of the appellate courts: "An appeal in a suit in which termination of the parent-child relationship is in issue shall be given precedence over other civil cases and shall be accelerated by the appellate courts."[64]

The State has an interest in the economical and efficient resolution of parental-rights termination cases.[65] A factual sufficiency challenge necessarily implicates greater delay for the child and expenditure of time and resources for the State. But the State's interests in economy and effi-ciency pale in comparison to the private interests at stake, and to the risk that a parent may be erroneously deprived of his or her parental rights and the child may be erroneously deprived of the parent's companionship if counsel unjustifiably fails to preserve error.

The State also has an interest in the consistent and uniform application of preservation of error rules.[66] As Justice Schneider pointed out in his *J.F.C.* dissent, "[t]his interest does not merely reflect a fiscal policy. Without uniform application of our error preservation rules, termination proceedings would be conducted and reviewed in an arbitrary manner."[67] Justice Schneider, however, reached the conclusion that the State's interest in uniformity and consistency "weigh[ed] in favor of conducting termination proceedings under our error preservation rules so that the proceedings are not unduly prolonged or unpredictable."[68] It is true, as we acknowledge above, that the State, the parent, and the child all share an interest in an expeditious and final decision. But the United States Supreme Court pointed out in *Santosky v. Kramer* that the State's interest in protecting the welfare of the child must initially manifest itself by working toward *preserving* the familial bond, rather than severing it.[69] Once it is clear that the parent cannot or will not provide a safe, stable family environment, then the State's interest in protecting the welfare of the child shifts to establishing that safe, stable, and permanent environment for the

61. *In re J.F.C.*, 96 S.W.3d at 304 (Schneider, J., dissenting).

62. *Id.* at 274.

63. *Id.* at 304 (Schneider, J., dissenting).

64. Tex. Fam.Code § 109.002(a).

65. *Lassiter*, 452 U.S. at 28, 101 S.Ct. 2153.

66. *In re J.F.C.*, 96 S.W.3d at 305 (Schneider, J., dissenting).

67. *Id.*

68. *Id.*

69. *Santosky*, 455 U.S. at 766–67, 102 S.Ct. 1388.

child elsewhere.[70] Therefore, the State's interest in meeting its ultimate goal in ensuring the safety and stability of the child "is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home." [71]

It is one thing, however, to have those procedures in place; it is quite another when counsel unjustifiably fails to follow those procedures. Thus, the State's initial interest in maintaining the familial bond versus its interest in maintaining procedural integrity weighs in favor of permitting a factual sufficiency review when counsel unjustifiably fails to follow those procedures.

The parent's, child's, and government's interest in a just and accurate decision dovetails with the third *Eldridge* factor— that of the risk of erroneous deprivation. Termination of parental rights is traumatic, permanent, and irrevocable. This fact has been pivotal for the United States Supreme Court.[72] And it is to us. For this reason, any significant risk of erroneous deprivation is unacceptable. That a motion for new trial is required for appellate review of a factual sufficiency issue is something that competent trial counsel in Texas should know. And filing such a motion is not a difficult task. But though a just and accurate result cannot ever be absolutely guaranteed, we cannot think of a more serious risk of erroneous deprivation of parental rights than when the evidence, though minimally existing, fails to

clearly and convincingly establish in favor of jury findings that parental rights should be terminated. Thus, if counsel's failure to preserve a factual sufficiency complaint is unjustified, then counsel's incompetency in failing to preserve the complaint raises the risk of erroneous deprivation too high, and our procedural rule governing factual sufficiency preservation must give way to constitutional due process considerations.

We do not hold here that every failure to preserve factual sufficiency issues rises to the level of ineffective assistance. Rather, our appellate courts must engage in a review using the established *Strickland* standards. That is, the appellate court must indulge in the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," [73] including the possibility that counsel's decision not to challenge factual sufficiency was based on strategy,[74] or even because counsel, in his professional opinion, believed the evidence factually sufficient such that a motion for new trial was not warranted.[75] As the Court of Criminal Appeals has stated, "[w]hen a motion for new trial is not filed in a case, the rebuttable presumption is that it was considered by the appellant and rejected." [76] In short, the courts must hold the parent's burden to show that "counsel's performance fell below an objective standard of reasonableness." [77]

■ The appellate courts must also conduct a review to determine whether coun-

70. *Id.* at 767, 102 S.Ct. 1388.

71. *Id.*

72. *See M.L.B.,* 519 U.S. at 116–18, 117 S.Ct. 555; *Santosky,* 455 U.S. at 759, 102 S.Ct. 1388; *Lassiter,* 452 U.S. at 27, 101 S.Ct. 2153.

73. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

74. *Id.*

75. *Smith v. State,* 17 S.W.3d 660, 662 (Tex. Crim.App.2000).

76. *Id.*

77. *Garcia,* 57 S.W.3d at 440.

sel's defective performance caused harm; in other words, whether "there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different." [78] The appellate court will conduct such a review to determine harm as if factual sufficiency had been preserved, under our established factual sufficiency standard in parental-rights termination cases, understanding that the evidentiary burden in such cases is "clear and convincing." [79]

More to the point, if the court of appeals finds that the evidence to support termination was factually insufficient, and that counsel's failure to preserve a factual sufficiency complaint was unjustified and fell below being objectively reasonable, then it must hold that counsel's failure to preserve the factual sufficiency complaint by a motion for new trial constituted ineffective assistance of counsel. In that case, the court of appeals should reverse the trial court's judgment, and remand the case for a new trial.[80]

As an aside, we note that Strickland also complained in her briefing here that her counsel failed to "file alternative pleadings that would allow the jury to consider less drastic alternatives than outright termination." But she did not argue anything further about that point, so we do not address it.

### III. Conclusion

We hold that a trial court errs in admitting into evidence orders that contain fact-findings. But in this case, Strickland was not harmed by that error. We hold, also, that the trial court did not err in admitting the Memorandum of Agreement. Finally, we hold that the statutory right to counsel under Texas Family Code section 107.013(a)(1) necessarily includes the right to effective assistance of counsel. But counsel's failure in this case to ensure the recording of the entire proceedings does not constitute ineffective assistance of counsel. On the other hand, we hold that counsel's failure to preserve the factual sufficiency issue may constitute ineffective assistance of counsel.

Consequently, we reverse the court of appeals' judgment. We remand to that court to determine whether counsel's failure to preserve the factual sufficiency issue was not objectively reasonable, and whether this error deprived Strickland of a fair trial.

---

**78.** *Id.* at 440; *see also Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

**79.** *In re J.F.C.,* 96 S.W.3d at 264.

**80.** *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.