

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

06-20-00029-CV
_____

IN THE INTEREST OF K.C., J.C., AND K.C., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2018-1733-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

The Department of Family and Protective Services (the Department) filed a petition to terminate Mother's parental rights to her sons, five-year-old Kalvin, and three-year-old twins, Jamar and Kaleb.[1] After a bench trial, the trial court terminated Mother's parental rights to the children after finding that (1) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, (2) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the children's return, as described in Section 161.001(b)(1)(O), (3) she used a controlled substance in a manner that endangered the health or safety of the children as described in Section 161.001(b)(1)(P) of the Texas Family Code, and (4) termination of parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P), (b)(2) (Supp.).

In her sole point of error on appeal, Mother challenges the factual sufficiency of the evidence supporting the trial court's best-interests finding. Because we conclude that the evidence was factually sufficient to support the finding that termination of Mother's parental rights was in the children's best interests, we affirm the trial court's judgment.

I.      **Standard of Review**

"The natural right existing between parents and their children is of constitutional dimensions." *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.—Texarkana 2015, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to

---

[1]We use pseudonyms to protect the identity of the children. *See* TEX. R. APP. P. 9.8.

make decisions concerning 'the care, custody, and control of their children.'" *Id*. (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is "required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* at 919–20 (quoting *A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* at 920 (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012))."'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (West 2014)); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "This standard of proof necessarily affects our review of the evidence." *Id.*

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial

3

reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting

*Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

> In determining the best interests of the child, courts consider the following *Holley* factors:
>
> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384

S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). "There is no

requirement that the party seeking termination prove all nine factors." *N.L.D.*, 412 S.W.3d at

819 (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Also, we may consider evidence used to

support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89

S.W.3d 17, 28 (Tex. 2002).

Mother challenges only the factual sufficiency of the evidence. "In our review of factual

sufficiency, we give due consideration to evidence the trial court could have reasonably found to

be clear and convincing." *L.E.S.*, 471 S.W.3d at 920 (citing *In re H.R.M.*, 209 S.W.3d 105, 109

(Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could

have found to be clear and convincing and determine 'whether the evidence is such that a

fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . .

allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109 (quoting *C.H.*, 89 S.W.3d at 25) (citing *In

re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed

evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). To make this determination, we undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id*. (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

## II.     The Evidence at Trial

Jessica Tullberg, an investigator for the Department, testified that Mother, who was on social security disability for blindness, had previously been investigated for abuse and neglect of her children. Kalvin was first removed from Mother after she tested positive for cocaine and remained in the Department's care for eleven months. The Department placed Kalvin with a relative and did not seek to terminate Mother's parental rights at that time because Mother agreed to have only supervised visitation with the child. Disobeying court orders, Mother accepted the relative's return of Kalvin to her. After another intake, the Department removed all

5

the children from Mother after it discovered that Kalvin was "down to the third percentile in his weight" and had to be hospitalized as a result of "extreme malnutrition," and the twins were found with physical injuries. The children remained in the Department's care for seven months but were returned to Mother in January 2018 after she completed a family service plan.

Tullberg said that the Department's new inquiry began on receipt of allegations in September 2018 that Kalvin was being underfed, physically abused, left alone in a room, and treated differently than the twins. When Tullberg went to Mother's home to investigate the most recent allegations, she smelled marihuana and noted that the strongest smell of the drug was coming from Mother's room, but Mother would not agree to take a drug test. Kalvin was in a "very bare room" with only a "box spring that had a blanket," a dresser, and a closet that was tied shut. A "mattress that was horizontally laid up against his door" prevented the child from leaving the room. While there were toys in the twins' room, there were no toys in Kalvin's room.

Tullberg witnessed injuries to all the children and photographed "visible injuries to [Kalvin's] upper right thigh and lower stomach area," chest, back, and arms. The photographs were admitted into evidence. Tullberg said that the photographs of Kalvin showed that the injuries were inflicted over a long period of time because they were in different stages of healing. Tullberg said that Mother feigned ignorance of Kalvin's extensive injuries, had no reaction when Tullberg assisted her in feeling the injuries with her hands, and claimed that the injuries must have been inflicted by the children's father, who had been incarcerated since the Department's last investigation. Tullberg also said that Kalvin was thin and had bald patches on his scalp and

6

that there was "barely anything in the refrigerator." Mother claimed that she had taken Kalvin to the doctor for his scalp issue, but Tullberg was not provided with any proof of medical treatment for this issue.

The children were removed from Mother's care and placed with fictive kin, whom Mother called "Aunt," even though they had no biological relationship. According to Tullberg, Kalvin made an outcry of physical abuse after the removal when he said that "his mom whoops him with a belt, a shoe and a switch." When confronted with Kalvin's outcry, Mother, who previously denied knowledge of Kalvin's injuries, blamed a former boyfriend for them and later admitted that she hit the child with a shoe. Mother also tested positive for marihuana after the removal.

Kemyisha Daniels, the caseworker with Child Protective Services (CPS) who was initially assigned to the case, testified that, during her involvement, Mother did not complete her family service plan. According to Daniels, Mother did not finish individual counseling or a drug and alcohol assessment, did not follow the recommendations of her psychiatric evaluation, and refused to complete four requested drug tests, citing different excuses each time.

Monica Writt, another CPS caseworker who took the case over from Daniels, testified that Mother did not complete any of the requirements of her family service plan. As a result of transportation issues due to her blindness, Writt testified that the Department arranged for a provider to come to Mother's home for individual counseling and parenting classes but that Mother did not take advantage of that accommodation. Writt also testified that Mother failed to maintain safe housing because she had lived in five different places since Writt was assigned to

the case. Writt also testified that Mother said that "she was living with her roommate, she did roll her roommate's blunts," and she did "[n]ot want any of the service providers over." When asked how Mother was able to roll blunts even though she was blind, Mother said it was because she had a lot of practice.

The Department provided Mother with two supervised visits per month. Tullberg testified that Kalvin became upset and started to cry at the thought of visiting Mother and told the Department that he did not want to see her. Despite his initial apprehensiveness, Daniels said that Mother had appropriate supervised visits with the children, but Daniels, Writt, and Aunt all said the children exhibited problems with caretakers, teachers, and others after those visits. Writt testified that the visits she observed were "very chaotic"; that Kaleb was aggressive toward Mother and would kick, spit, and say mean things; and that Mother lacked control and showed that "parenting was an issue." Daniels and Writt both testified that Mother was consistent with her visitation and loved her children, but Writt said Mother had more of a bond with the twins.

Daniels and Writt testified that Aunt cared for the children and became licensed as a "foster to adopt home," and Aunt testified that she wished to adopt the children. Aunt said she was an employee of Longview Christian School, where she had worked for forty years, and lived with her sister and the boys in a two-bedroom, one-bathroom home. Writt and Karen Bonds, a Court Appointed Special Advocate (CASA), testified that they visited Aunt's home every month and labelled it appropriate and loving. While the children were never placed in daycare under Mother's care, Aunt testified that the twins attended daycare and Kalvin went to Montessori and was in an afterschool program.

Writt and Bonds testified that Aunt met the children's needs and that the children were very bonded with her and were thriving in her care. Aunt said that the children's behavior had improved since their placement with her. Writt, Bonds, and Aunt testified that it was in the children's best interests for Mother's parental rights to be terminated. Due to the children's apprehension before visits with Mother and poor behavior afterwards, Aunt believed that it was best for the children not to continue having contact with Mother. Aunt also said that she had a good support system, including her three sisters, to help her if needed.

At trial, Mother admitted that she started smoking marihuana in 2015, was using the drug in her room while the children were in the home, and was still smoking it during the pendency of the case. Mother said she quit smoking marihuana after the second investigation by the Department but picked up the habit again after the children were returned to her because she "felt as though [she] was going back to living [her] regular life," which included using marihuana. She admitted that she smoked marihuana in the same room where the twins slept. Mother said that she "never had an opportunity to really bond with [Kalvin] due to [her] choices" but did not want anyone else to raise her children. Mother denied ever abusing the children and, even at trial, said she felt nothing when Tullberg guided her hands over Kalvin's injuries. She admitted that she did not complete the family service plan, and when asked what growth she had undergone since the children's removal, Mother testified, "To be honest, no growth. I gave up."

Mother said the children were doing well in Aunt's care, which was a good placement for them, admitted she could not show the trial court that she could provide for the children's stability, and testified she had moved three different times after her eviction. Mother said, "I

9

would rather my children stay with my aunt . . . , and if I have the opportunity to be able to be in their life, I would love it. But if not, I accept it."

After hearing this evidence, the trial court terminated Mother's parental rights.

### III.     Analysis of the *Holley* Factors

Jamar and Kaleb were too young to express their desires under the first *Holley* factor, but Aunt testified that Kalvin did not want to visit his Mother and only agreed to do so after Aunt reassured him that he would be returned to her. This showed that Kalvin did not wish to return to Mother. We conclude that the first *Holley* factor weighs in favor of termination of Mother's parental rights to Kalvin and is neutral as to Jamar and Kaleb.

The second *Holley* factor showed that the emotional and physical needs of the children now and in the future were great. Aunt testified that all the children were in counseling. Writt said that Jamar received speech therapy, and all the children were being evaluated for occupational therapy. Kaleb still had disciplinary problems, which were improving in Aunt's care. While Mother had not provided evidence of proper care for Kalvin's scalp issues, Writt testified that Aunt was meeting the children's needs and that insurance would cover medical and mental health treatment for the children if adopted by Aunt. We find that the second *Holley* factor favors termination of Mother's parental rights.

In evaluating the third, fourth, and eighth *Holley* factors, we recognize that "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re C.A.J.*, 459 S.W.3d 175, 183 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2004, pet. denied) (mem.

10

op.)); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")). "A parent's inability to provide adequate care for her child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interests." *N.L.D.*, 412 S.W.3d at 819 (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). Also, "[p]arental drug abuse is also a factor to be considered in determining a child's best interests." *N.L.D.*, 412 S.W.3d at 819 (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)). Writt testified that, although Mother attempted to blame others for Kalvin's physical abuse, Kalvin had only made outcries against his mother during the pendency of the case, and all three children had permanent scars as a result of physical abuse. Although Mother expressed her love for the children and the desire to be their mother, there was ample evidence showing that Mother either physically abused all the children or failed to protect them from physical abuse, malnourished Kalvin, and smoked marihuana in her room while the twins were sleeping beside her. Mother's history of CPS involvement, drug abuse around the children, failure to remain drug free during the pendency of this case, lack of control during visits, and failure to complete services because she had given up showed that the existing parent-child relationship was not a proper one, Mother lacked parental abilities, and she could be a danger to the children in the future. We find that the third, fourth, and eighth *Holley* factors weigh in favor of terminating Mother's parental rights.

Under the fifth and ninth factors, there were several programs available to assist Mother through her family service plan. Tullberg testified that, after all the children were previously removed from Mother, she had successfully completed parenting, counseling, drug counseling,

11

and other services, but Mother failed to complete any portion of her family service plan during this case. Although Mother had transportation issues due to blindness, the Department arranged for providers to go to Mother's home for counseling and parenting, but Mother failed to take advantage of those special accommodations. Due to her blindness, Mother received $996.00 in social security disability benefits. Even so, the Department showed that Mother could have received separate services and sums to assist her in caring for the children but had not done so. The Department also showed that, whether adopted by Aunt or not, monthly stipends and insurance coverage would be available to assist in caring for the children.[2] We find that the fifth and ninth factors weigh in favor of terminating Mother's parental rights.

As for the remaining *Holley* factors, Daniels testified that Mother had an appropriate home, but Writt testified that Mother was evicted from that house and was living with a roommate for whom she was rolling "blunts." At trial, Mother admitted that she did not have a stable home. "A parent who lacks stability . . . and a home is unable to provide for a child's emotional and physical needs." *C.A.J.*, 459 S.W.3d at 183 (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)). Mother's plan was for the children to continue to live with Aunt. Writt testified that Aunt was financially stable and provided appropriate housing. Aunt testified that she loved the children and wished to adopt them and that continued contact with Mother was

---

[2]Daniels testified that the children could remain with the current caregiver and that the caregiver would receive between $400.00 and $500.00 per child per month for permanency care assistance, even if Mother's parental rights were not terminated.

against their best interests. As a result, we find that the remaining *Holley* factors support terminating Mother's parental rights.

Considering the *Holley* factors and viewing all the evidence, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). As a result, we overrule Mother's sole point of error.

## IV. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:    August 24, 2020
Date Decided:      September 16, 2020