

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00421-CV

IN THE INTEREST OF L.M. AND
L.M., CHILDREN

----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 16-07353-16

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court terminated the parental-child relationships

of J.P.M. (Mother) and Appellant R.S. (Father) with their children, fraternal twins

L.M. and L.M. (the twins).  The trial court found that Mother had executed an

unrevoked or irrevocable affidavit of relinquishment of her parental rights and that

termination of the parental rights of both parents was in the children's best

---

[1]*See* Tex. R. App. P. 47.4.

interests. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K), (2) (West Supp. 2017). The trial court also found that Father

- knowingly placed or knowingly allowed the [twins] to remain in conditions or surroundings which endanger[ed their] physical or emotional well-being;

- engaged in conduct or knowingly placed the [twins] with persons who engaged in conduct which endanger[ed their] physical or emotional well-being; [and]

- failed to comply with the provisions of a court order that specifically established the actions necessary for [him] to obtain the return of the [twins] who ha[d] been in the . . . temporary managing conservatorship of the Department of Family and Protective Services [(TDFPS)] for not less than nine months as a result of [their] removal from the parent . . . for . . . abuse or neglect.

*Id.* § 161.001(b)(1)(D), (E), (O). Only Father appealed. He does not challenge the sufficiency of the evidence to support termination. Instead, in two issues he contends that (1) the trial court abused its discretion by "specifically prohibiting [his] counsel from seeking an extension of the dismissal deadline, preventing a request for continuance and/or jury trial" and (2) his trial counsel was ineffective by failing "to request a continuance, extension, or jury trial following her late appointment." Because we hold that Father did not preserve his first issue and did not satisfy his burden to prove ineffective assistance of trial counsel, we affirm the trial court's judgment.

## I.    BACKGROUND FACTS

### A.    The Twins Tested Positive for Methamphetamine at Birth.

Born prematurely in early September 2016, the twins tested positive for

2

methamphetamine. Mother admitted to TDFPS Investigator Tricilla Ceballos that she had used methamphetamine during her pregnancy but claimed that she stopped in March 2016 when she found out she was pregnant. Mother also admitted to Ceballos that she had been around Father while he used methamphetamine as recently as the day before her delivery. Finally, Mother alleged that Father had been violent with her during the pregnancy.

**B. TDFPS Filed a Petition to Terminate Mother's and Father's Parental Rights, and Father Missed the First Hearing.**

On September 12, 2016, TDFPS filed a petition for termination and secured an ex parte emergency order for protection of the twins. Father did not attend the adversary hearing held September 22, 2016, but went to the trial court that same day and obtained a one-week reset of the adversary hearing pertaining to him.

**C. Father Retained Counsel Who Quickly Withdrew.**

The record shows that retained counsel filed an answer on Father's behalf on September 26, 2016 but then withdrew pursuant to a motion and agreed order on September 29, 2016, and Father was given another one-week reset of the adversary hearing because he indicated that he wanted to retain new counsel.

**D. Father Missed the Hearings in October and November 2016 but Knew by October 2016 that He Had a Right to Counsel and Had Been Ordered to Complete Services.**

Father did not attend the October 5, 2016 adversary hearing or the November 10, 2016 status hearing but admitted at trial that he received a copy of

3

the October 2016 temporary order in October.  That order included the following

provisions regarding Father's right to counsel:

> **5.  Appointment of Counsel for Parents or Parties**
>
>> 5.1.  The Court defers its finding regarding an attorney *ad litem* for [FATHER] because [he] has not appeared in opposition to this suit or has not established indigency.
>
>> . . . .
>
> **22.  Duty to Provide Information**
>
>> . . . .
>
>> **22.8.  "YOU HAVE THE RIGHT UNDER §262.102(d), TEXAS FAMILY CODE, TO BE REPRESENTED BY AN ATTORNEY.  IF YOU ARE INDIGENT AND UNABLE TO AFFORD AN ATTORNEY, YOU HAVE THE RIGHT TO REQUEST THE APPOINTMENT OF AN ATTORNEY BY CONTACTING THE COURT AT 16th JUDICIAL DISTRICT COURT OF DENTON COUNTY, 1450 E MCKINNEY ST, DENTON, TEXAS 76209, (940) 349-2310.  IF YOU APPEAR IN OPPOSITION TO THE SUIT, CLAIM INDIGENCE, AND REQUEST THE APPOINTMENT OF AN ATTORNEY, THE COURT WILL REQUIRE YOU TO SIGN AN AFFIDAVIT OF INDIGENCE AND THE COURT MAY HEAR EVIDENCE TO DETERMINE IF YOU ARE INDIGENT. IF THE COURT DETERMINES YOU ARE INDIGENT AND ELIGIBLE FOR APPOINTMENT OF AN ATTORNEY, THE COURT WILL APPOINT AN ATTORNEY TO REPRESENT YOU."**

The temporary order also contained global provisions about the court-

ordered service plan:

> **12.  Finding and Notice**
>
>> **THE COURT FINDS AND HEREBY NOTIFIES THE PARENTS THAT EACH OF THE ACTIONS REQUIRED OF THEM BELOW ARE NECESSARY TO OBTAIN THE RETURN OF THE**

**CHILDREN, AND FAILURE TO FULLY COMPLY WITH THESE ORDERS MAY RESULT IN THE RESTRICTION OR TERMINATION OF PARENTAL RIGHTS.**

**. . . .**

**20. Compliance with Service Plan**

> **20.1. [FATHER]** is **ORDERED,** pursuant to 263.106 Texas Family Code, to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit.

Between those two global provisions, the order set out detailed services that Father was ordered to engage in and complete, including a psychological or psychiatric evaluation, counseling, parenting classes, domestic violence intervention, and drug and alcohol assessments and testing; statuses he was ordered to attain, including stable housing and employment; and activities he was ordered to not engage in, including all criminal activities and unsupervised contact with children under sixteen years of age.

**E. The Trial Court Told Father at the First Hearing He Attended—the February 9, 2017 Permanency Hearing—that He Should Apply for Appointed Counsel and Begin His Court-Ordered Services.**

The first hearing that Father attended was the February 9, 2017 permanency hearing held almost five months after the twins' removal. Father testified that he did not have a lawyer. TDFPS's counsel asked, "And you understand that you have the right to apply to the Court, if you qualify as indigent, for a Court appointed attorney? Have you been through that process?" Father replied, "No." After TDFPS's counsel and the twins' attorney ad litem finished

5

examining Father, the following discussion occurred between Father and the trial court:

THE COURT: All right. And [Father], is this your first time to attend a court hearing in this case?

[FATHER]: Yes, ma'am. . . . I didn't know anything was going on for eleven days after the[ twins] got taken by CPS. . . . [A]ll my calls were ignored by the initial CPS worker. So the day before my first court appearance I was told by an outside source. And I showed up with a lawyer. I had to quickly get a lawyer to postpone it for a week. And then financial issues came up that second week, and she had to basically take her name off as being my lawyer.

They reset for a week, and I was told a week. And it was apparently six days. And I just got the date wrong. So I came in the third day, and that was after everything had gotten taken care of.

THE COURT: Have you tried to hire a lawyer since then?

[FATHER]: Not since then, no. I kind of went into a financial depression, if you will.

THE COURT: Okay. So before you leave here today, I want you to complete a form and let me review it and determine whether or not you qualify for a Court appointed attorney.

[FATHER]: Okay. Thank you.

THE COURT: All right. And so let me just follow up with that and ask you, have you signed up to do any services?

[FATHER]: No. I lost my vehicle . . . about three weeks after the final court appearance. That was the third week that I came in when I was a day late. And everything basically got taken, you know, there

6

was no hearing for me. About three weeks later I got my car repo'd because I lost my job and everything. Well, I didn't lose my job. I kind of just wasn't working.

THE COURT:   Okay.

[FATHER]:   And so I just kind of lost everything. So I was trying to figure out what to do.

THE COURT:   So you're here today. Caseworker is here today. So I'm going to tell you that you need to talk to her today if you intend to do anything about getting started on your services.

[FATHER]:   I got my car yesterday. I talked to some guy today, but it doesn't start until March.

THE COURT:   Okay, well, nonetheless—

[FATHER]:   My stuff got transferred to Tarrant County.

THE COURT:   Nonetheless, this case has been pending for just a little over five months. These cases are supposed to be concluded within twelve. So we're almost halfway—we're getting close to the halfway mark, and you haven't done anything at this point. So you need to get moving if you're going to do something.

Do you understand?

[FATHER]:   Yes, ma'am.

Before the hearing ended, the trial court reminded the parents,

[T]he CPS plan is a very important document. Its purpose is to provide you with skills and knowledge that you need in order to become better parents to your children. The Court is going to review, at each hearing, whether or not you've made progress under your service plan. The review will include whether you've acquired or learned any specific skills or knowledge as stated in the plan.

If you are unwilling or unable to provide your children with a safe environment, your parental and custodial duties and rights may

7

be restricted or terminated or your children may not be returned to you. Do you understand that, [Father]?

Father replied, "Yes, ma'am."

**F.    By May 11, 2017, About Eight Months After the Twins' Removal, Father Had Not Begun the Court-Ordered Services.**

Three months later at the May 11, 2017 permanency hearing, Father testified as follows in TDFPS's counsel's direct examination:

Q.          [Father], have you received a copy of your service plan?

A.          Yes.

Q.          What services have you started?

A.          None.

Q.          Are you currently employed?

A.          Yes.

Q.          Where are you employed?

A.          Self-employed.

Q.          Doing what?

A.          Doing like product placement.

Q.          How often do you work?

A.          Pretty much anytime I can when—I've had major car problems, vehicle problems in the past two months.

. . . .

Q.          In the last six months, what has hindered you from starting your services?

A.          Pretty much car trouble.

Q.          Have you asked [TDFPS] to look into assisting with transportation?

| A. | I live an hour and fifteen minutes away. |
|---|---|
| Q. | So have you asked [TDFPS] to assist you— |
| A. | Nope. |
| Q. | Have you asked [TDFPS] to establish services closer to where you live? |
| A. | Yes.  Some of them have been. |
| Q. | And you still haven't gone? |
| A. | Nope. |
| . . . . | |
| Q. | Do you understand what is contained within your service plan, as far as what you need to do? |
| A. | Yeah. |

**G. In the May 11, 2017 Hearing, Father Questioned the Requirement that He Have No Unsupervised Contact with a Minor Younger than Sixteen Years Old.**

After Mother testified, TDFPS's counsel recalled Father to the stand:

| Q. | [FATHER], how old is your son [B.]? |
|---|---|
| . . . . | |
| A. | . . . .  He just turned nine. |
| . . . . | |
| Q. | Who is he with? |
| A. | His mother. |
| Q. | Do you recall the temporary orders in this case? |
| A. | Yep. |
| Q. | And do you recall part of those temporary orders— |
| THE COURT: | The answer is, "yes," sir.  We don't say, "yep," in here.  Yes or no. |

9

[FATHER]:       Yes, I do.

Q. (By [TDFPS])   And do you recall that part of the temporary orders that you're not to have any unsupervised contact with any child under the age of sixteen?

A.              Yes, I do.

Q.              Did you tell your child's mother that?

A.              No.  I told my caseworker who said, that's okay, there's nothing on him.

Q.              But you understand what is in this Court['s] orders, correct?

A.              Sure.

Q.              Are there any Court orders regarding B[.]?

A.              No.

. . . .

Q.              Do you think this is funny?

A.              Am I laughing?  I'm just talking.

THE COURT:      Yeah, I'll note for the record that you have been laughing and smirking throughout the entire hearing.

[FATHER]:       I laughed at some of the comments that I heard, yes.  But I didn't say anything else.

THE COURT:      I didn't ask for a response.

[FATHER]:       Okay.

THE COURT:      I noted for the record your demeanor in the courtroom.

[FATHER]:       Okay.

Q. (By [TDFPS])   Do you understand that you're not to have any unsupervised contact with B[.], and you're being told that today in court?

10

| | |
|---|---|
| A. | Really, like, may I ask why? That's my son, and he has nothing to do with this case. |
| [TDFPS]: | Your Honor, I would object— |
| [FATHER]: | I'm asking why because I don't understand it. Because I asked my CPS caseworker a long time ago. |
| THE COURT: | [Father], you signed a service plan in this case that said . . . you are not allowed to have unsupervised contact with children under the age of sixteen years of age— |
| [FATHER]: | What's unsupervised? |
| THE COURT: | Unsupervised. You and a child and I don't care what child that is. |
| [FATHER]: | Okay. |
| THE COURT: | If it's your child or if it's somebody else's child, you signed a service plan agreeing that . . . you were going to be governed by that. And the Court entered an order saying that, so you're in violation of the Court order. |
| [FATHER]: | Okay. I'm sorry. |

When Caseworker Christina Ross was recalled to the stand, she denied telling Father that he could have unsupervised contact with B.

At the end of the hearing, the trial court reiterated the importance of the service plan, stated that the parents' progress under the service plan would be reviewed at all later hearings, and warned the parents that if they would not or could not provide the twins with a safe environment, their parental rights could be terminated. The trial court confirmed that Mother understood the service plan information, and then the following occurred,

| | |
|---|---|
| THE COURT: | Do you understand that, [Father]? |

11

| [FATHER]: | No, ma'am. |
|---|---|
| THE COURT: | You do not understand that? |
| [FATHER]: | Yes, ma'am. |
| THE COURT: | And I would further direct [TDFPS], even though it would appear that this child . . . , [B.], is not in this Court's jurisdiction, to please do what you need to do to investigate whether or not that child is safe. |

## H. Appellant Did Not Retain New Counsel or Apply for Appointed Counsel by the May 11, 2016 Hearing.

When the trial court announced which parties and attorneys were present for the record, the following dialogue occurred:

| THE COURT: | [Father], do you have an attorney? |
|---|---|
| [FATHER]: | No. |
| THE COURT: | You had one at one time, right? |
| [FATHER]: | The very beginning. |
| THE COURT: | Okay. All right. |

After Father's testimony indicating he was violating the trial court's order regarding unsupervised access to a minor, and Caseworker Ross's testimony denying that she had approved the violation, the other parties declined to question her. The following then occurred:

| [FATHER]: | I want to talk. Can I talk? |
|---|---|
| THE COURT: | I'm going to ask you some questions in a minute—- |
| [FATHER]: | Go ahead. Go right ahead. |
| THE COURT: | You'll have an opportunity. |

12

[FATHER]:          Okay.[2]

After the trial court received updates from the CASA volunteer and Mother

about progress on the case, the trial court spoke to Mother:

> And the last thing you've got time to do is be messing with him [Father], okay?  He's trouble.  And so you don't need to be wasting any of your energy or time on him.  His problems are his problems.  Let him deal with his own stuff, okay?  Because you've got plenty to take care of on your own, understood?

The trial court then addressed Father again:

THE COURT:     All right.  [Father]?

[FATHER]:        Ma'am.

THE COURT:     Okay.  . . . I'm not really sure why you're here, honestly.

[FATHER]:        I'm trouble.

THE COURT:     You haven't done anything from the very beginning that you got here.  You didn't show up the first day.  You got a lawyer—

[FATHER]:        What first day?

THE COURT:     I am not asking you to talk to me.  I am telling you to listen right now.

[FATHER]:        You should tell me to listen.  I am very sorry though.

THE COURT:     Don't say another word until I tell you that it's your turn to talk, okay?  You had a lawyer when you got here.  And within two or three weeks, that lawyer withdrew from representing you.  When you were here in February, I ordered you to sit down and fill out an application for an attorney so

---

[2]While the reporter's record uses "THE WITNESS" to refer to the speaker in this section, it is clear from the context that the witness in this quotation is Father, not Caseworker Ross.

13

that we can see if you qualified for an attorney because you need one in the worst possible way.

If you care anything about your children, if you care anything about having any type of relationship with them, you need a lawyer to be giving you some advice to get you straightened out—and I will let the record reflect that [Father] is yawning as I am talking to him right now. You need someone to give you some advice to help you figure out what to do about getting your children back if there's any possibility whatsoever.

And I'm telling you right now, that is a pretty slim possibility because as I told [Mother], we are two-thirds of the way through this case. And she's at least started doing some things. You've done nothing except come in this court and smirk and be disrespectful. That's the only thing I've seen you do anytime that you've ever been here.

So as we stand here today, four months away of the twelve-month mark on this case, you are not represented by an attorney because you, A, won't hire one, or B, won't even bother to fill out a form to ask the Court to see if you would qualify for an attorney even though you've been told to do that. And you're doing basically nothing on your service plan and have represented to the Court here today that you're directly violating one of the orders in the service plan.

So I don't know what else to say to you, sir.

[FATHER]:        Okay.

## I.  Father Finally Completed an Application for Appointed Counsel on the Day Before the August 11, 2017 Docket Call, Eleven Months After the Removal.

At the August 11, 2017 docket call, the following dialogue between the trial court and Father took place:

14

THE COURT: All right. You are here this morning without counsel as you have been throughout this case, correct?

[FATHER]: I filled out the paperwork.

THE COURT: That's not the question. You're here without a lawyer, right?

[FATHER]: Yes, ma'am.

THE COURT: And just about every time you've been in my Court for the last year, I've asked you what you were doing about a lawyer; isn't that true?

[FATHER]: Yes, ma'am.

THE COURT: And for a very short while, you had a lawyer; is that true?

[FATHER]: One week.

THE COURT: One week. Okay. But for the balance of the case, you haven't had one. And each time you've been in here, I have invited you to apply for a lawyer so that you would have someone to represent you in this case; isn't that true?

[FATHER]: Yes, ma'am.

THE COURT: And you haven't done that; isn't that true?

[FATHER]: I did that yesterday, ma'am.

THE COURT: You did that yesterday?

[FATHER]: I tried to save up the money, so I wasn't having to charge—I was trying to sa[v]e up the money. I couldn't do it.

THE COURT: Okay. Well, I don't care what your reason is. Your parental rights were at stake throughout this case, and each and every time you were in here, I told you that; isn't that true?

[FATHER]: Yes, ma'am.

| THE COURT: | And now you've waited until the eve of trial to apply for a lawyer. I don't know what your motivation is, if you think that's going to delay things, then you're quite wrong. We are going to get this case resolved by the twelve-month period. Do you understand? |
|---|---|
| [FATHER]: | Yes, ma'am. |
| THE COURT: | And you've heard me say this morning that that is September the 12th. So this case is going to be tried. I will review your application. Do not leave until I have done that. Do you understand that? |
| [FATHER]: | Yes, ma'am. |

## J. The Trial Court Reset the Trial Date from August 21, 2017 to September 11, 2017.

The trial court then stated on the record that the case would be reset to September 11, 2017 because a visiting judge would be sitting for the trial court on the original trial date. She further clarified that the trial would be a bench trial because Mother had waived a jury trial in her affidavit of relinquishment. Father did not object to the absence of a jury trial. He had not previously requested a jury trial and did not do so at this hearing or at any time in the trial court.

## K. The Trial Court Appointed Trial Counsel for Father.

While resetting the trial date, the trial court stated,

And I am going to have to appoint him a lawyer, most likely, even though it is at the last minute. I am not granting an extension on this case. So whoever gets it is going to have to get their trial britches out and ironed and ready to go.

The trial court then questioned Father about his income, expenses, and debts on the record, and the following dialogue occurred,

16

THE COURT:    Well, like I told you a while ago, I mean, this . . . creates a problem that you've waited so long to apply for a lawyer.

[FATHER]:    Yes, ma'am.  I understand.  I tried to talk to them.

THE COURT:    . . . [T]he Courts take the position that you're entitled to have a lawyer.  The law says you're entitled to have a lawyer if you qualify for one as being indigent.  You're kind of on the cusp, but the Court doesn't want to take any chances that your parental rights could be terminated without you being properly represented by an attorney. So—

The trial court then introduced trial counsel and Father and stated that the case had been set for August 21 but was now going to be reset to September 11.

Father's new trial counsel responded, "Okay."  The trial court went on:

The dismissal date on it, I believe, is about September 12th. So we are kind of at the very end of that.  And I will just say that [Father] and I have had extensive discussions prior to today and today in which I have asked him almost every time he's been here . . . what his intentions were with regards to getting a lawyer. He had a lawyer that he had hired for a very short while.  He told me a week.  And then he hasn't had one.

I have encouraged him many times to apply for an attorney. He has not done that until yesterday.  So having said that, I told him that the Court is not going to extend this case for his lack of asking for an attorney.

However, [I] certainly don't want him to be prejudiced unduly by not having one, so I am going to appoint you to represent him. And it is set for a bench trial on September 11th.  I understand that is asking a lot of you to come into a case at this particular juncture, but you know as well as I do what the position of the Courts [is] with regard to parents being represented.  So we want to make sure that he is.

The trial court next announced that the docket call would be at 8:30 a.m. on September 1, 2017—approving Father's trial counsel sending a substitute because she had already planned to be out of town that day—and repeated that the trial would begin on September 11.

## L.    About Ten Months After the Services Were Ordered, Father Began Actively Engaging in Some of Them.

Four days after the docket call, Father's trial counsel filed an amended answer in which she also asked the trial court to "[a]llow sufficient time for [Father] to complete any court ordered counseling, parenting classes, and anger management classes as is proved necessary by the competent evidence," but the record contains no indication that the request was presented to the trial court.

Six days after the docket call, on August 17, 2017, the trial court held a permanency hearing.  The evidence showed that Father lacked two weeks of parenting classes, had begun counseling, and had scheduled his psychological evaluation and Batterers' Intervention and Prevention Program (BIPP) classes. Father testified that he waited so long to begin his services because he had been depressed and homeless.  He also testified that since April 2017 he had been living in Benbrook with a roommate and her two children.  The following exchange occurred between Father and the trial court:

THE COURT:    You understand part of your service plan is that you not be around children under the age of sixteen years of age?

[FATHER]:    Unsupervised, yes.

18

THE COURT:    And you're telling the Court that this roommate that you have is always there when the children are there?

[FATHER]:     No. She takes them with her when she leaves.

THE COURT:    And—

[FATHER]:     I'm not jeopardizing anything else.

THE COURT:    When you say, "roommate," are you talking about someone you share expenses with, or do you have a personal, intimate relationship with this person?

[FATHER]:     It's kind of half and half.

. . . .

THE COURT:    . . . . [Father's trial counsel] was actually appointed [August 11, 2017]. As the Court noted on the record that day and I have every other time we've been here, [Father] did not have a lawyer and had not—despite the Court's urging on numerous occasions—applied for an attorney until that day or actually the day before that, I believe, he left off an application. The Court reviewed it and appointed [counsel] to represent him.

              I can see that [Father's trial counsel] has been earning her pay because she's encouraged [Father] to get involved in services, which he should have been involved in all this time. So we are set for a bench trial on September 11th[.]

The CASA volunteer and Caseworker Ross then testified that Father had sent threatening texts to Mother and Ross after the last permanency hearing (when the trial court suggested that TDFPS do something about his older son), and Father denied it, claiming that Mother had set him up. The trial court concluded the hearing by stating that the service plan was important, that the court would

19

review Father's progress on the plan at all subsequent hearings, and that his rights could be terminated if he could not or would not provide the twins with a safe environment.

Father signed the family service plan on September 7, 2017.

**M.     The Bench Trial Began on September 11, 2017, with Father's Direct Examination by TDFPS.**

Father testified that:

- He knew Mother was using drugs during the pregnancy;

- He used methamphetamine with her during the pregnancy, even though they both knew at the time that she was pregnant;

- He "[p]robably" told his caseworker that he had nothing to lose;

- He denied that he had played any part in the twins' removal;

- In 2008, when he was "[t]wenty-eight or something," he was placed on probation for enticing a sixteen-year-old child;

- He was present at the first temporary orders hearing but told the trial court that he was going to retain counsel;

- He did not appear at the October 5 temporary orders hearing because he mixed up the dates and "showed up the next morning";

- He received a copy of the temporary orders in October 2016;

- He waited "[a]bout six months" to start services "[b]ecause [he] was in denial" and "didn't have any kind of means to get to any of [his] services even though [he] was trying and . . . was struggling to get to [his] visits";

- His address was "pending";

- He had been staying with a friend in Fort Worth for nine or ten days;

- He had left the Benbrook address "[b]ecause the Court[] open[ed] up a CPS case down there [in Tarrant County] because [of] the

20

unsupervised visit that was part of [his] services. And so [he] got done with that case. [He] decided to not put the roommate in jeopardy anymore and left";

- At the end of September 2017, he would move into a house with a roommate and no children;

- He had completed First Steps, his parenting classes, a psychological examination, and two "evaluation type things";

- He was still in counseling and BIPP;

- He did not begin BIPP in October 2016 because he "was in defiance of what happened";

- He had not yet attended NA or AA, which he was required to attend twice a week, because he "was just told about" that requirement the week before trial began, but he admitted that Caseworker Arianna Hughes had "suggested" AA/NA in October 2016;

- He had not begun outpatient drug treatment yet;

- He did not submit to requested drug tests on three or four occasions;

- He did not need drug treatment; and

- He had visited with his children consistently since March or April of 2017 and had missed earlier visits because he did not have transportation.

Father denied:

- ever hitting or pushing Mother;

- threatening her in a text message; and

- all responsibility for the twins' removal.

After TDFPS finished its direct examination of Father, the trial court reset the case to 9:00 a.m. on November 7, 2017. Father's trial counsel then invoked the Rule as to Mother and Caseworker Hughes.

21

**N.  The Trial Did Not Resume Until Two Months Later.**

The second day of trial began on November 13, 2017, a little more than two months after the first day of trial, allowing Father two more months to complete services and giving his counsel two extra months to prepare for trial.

**O.  The Trial Focused on Father's Conduct Before and After the Twins' Removal.**

On cross-examination by his trial counsel, Father admitted that:

- He had supplied Mother with methamphetamine during her pregnancy but denied that he had used any illegal substances "while the kids were coming";

- He had used methamphetamine in April 2017—while the case was pending—but denied being an addict;

- In October 2017, he had moved back to Benbrook to live with the woman and children with whom he had lived before while the case was pending and had told TDFPS but not CASA about the move.

Father also testified:

- He had taken Mother to the hospital for the twins' delivery and had stayed at the hospital with them for three days;

- Father saw his infant son once in September 2016 after the baby was discharged from the hospital;

- Visits were postponed from late September until early November 2016 because of the twins' fragile health, but even after November 2016, Father saw them only sporadically until May 2017;

- During the two or three months after the twins' birth, he "was in such a depression" and "basically fighting against everything that happened"; he "hadn't accepted it yet";

- He "kind of lost everything, as far as vehicles, confidence and job, well, not [his] job[, b]ut [he] wasn't able to go to [his] job because of the vehicle situation" and because he "wasn't able to mentally go to the jobs";

22

- He lost his home;

- He could not get to the visits with the twins (when they resumed), which were one and a half hours away from his home, much less to the drug tests;

- Things got better in April 2017 when he leased a car and realized that he needed "to do this by [him]self";

- He completed his ten-week parenting class in August 2017;

- He completed his psychological examination on September 6, 2017;

- He completed counseling;

- He had been attending NA/AA meetings for a few months, twice a week;

- He had started BIPP again but still did not see himself as a batterer; and

- The services had always been available in Tarrant County, but he just had not become "serious about them."

On cross-examination by the twins' attorney ad litem, Father testified that:

- He was familiar with the 12-step program, was on Step 1, did not know what it was because "[he had not] completed the . . . program [but was] just attending the classes like ordered"; and

- He did not have a sponsor because he did not "need to talk to someone about drugs when [he] had no desire to use them."

On redirect examination by TDFPS, Father admitted:

- His September 2017 drug test was positive for marihuana; and

- On October 3, 2017, he had become angry at First Steps, the location of his outpatient drug treatment, during his intake session, cursing and "flip[ing] off" personnel.

TDFPS next called Marvin Furdge, a drug and alcohol counselor at First Steps. Furdge testified that he had assessed Father as having a cannabis use

23

disorder, had determined that Father had poor insight and judgment, and had recommended supportive outpatient treatment, attendance of a support group meeting at least twice a week, working with a sponsor, and individual counseling. Furdge also testified that Father minimized his role in the twins' removal.

Caseworker Adriana Hughes testified:

- Mother told her Father used drugs and was violent with Mother during the pregnancy;

- Father was "verbally aggressive" with her and with the observer of his visits with the twins;

- "[Father] did not take direction very well. And he just continued to shift the blame elsewhere";

- She did not tell Father that he could have unsupervised contact with B.;

- Father never asked for help with his depression; and

- She did not see Father make any changes to his life or his approach to the case during her five months on the case.

Caseworker Ross also testified that she had not observed any changes to Father's life in her seven months on the case. But she admitted on cross-examination that Father had tested negative for drugs on September 22, 2017 and again on October 5, 2017.

During the trial, Appellant's trial counsel actively participated—objecting successfully, cross-examining TDFPS's witnesses, calling her own witness (Father's mother), and offering several exhibits.

**P.    The Trial Court Summarized Her Interactions with Father Regarding His Obtaining Counsel.**

After the trial but before rendering the judgment, the trial court stated,

I think I could best characterize my interactions with [Father] to be from not only ordering him, to begging him to ask for a lawyer to get assistance in trying to work his services to get people to help him. He waited until the Thursday literally before this case was set to go to trial in September to come to this Court and ask for an attorney. And the Court immediately appointed [Father's trial counsel] to the case.

And I would say that I will give her a lot of credit for having done what she should have done as a lawyer in helping [Father] understand the importance of getting working on his services, albeit at such a late date.

## II.    DISCUSSION

**A.    Father Did Not Preserve His First Issue.**

In his first issue, Father contends that the trial court abused its discretion by "specifically prohibiting" his trial counsel from "seeking an extension of the dismissal deadline for a continuance of the trial setting," "violating his due process rights to a fair trial" and "restrict[ing him] from exercising his constitutional right to a jury trial." Father did not raise this complaint in the trial court, and the request for more time to complete certain services, embedded in his second answer to the petition, was not presented to the trial court for a ruling.

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid.

103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). Because Father neither gave the trial court an opportunity to rule on a motion to extend the dismissal deadline or a motion for continuance nor asked the trial court for or complained about the lack of a jury trial, he failed to preserve this issue. We overrule Father's first issue.

**B.    Father Did Not Prove That His Trial Counsel Was Ineffective.**

In his second issue, Father contends that his trial counsel was ineffective by failing "to request a continuance, extension, or jury trial following her late appointment." Indigent parents have a statutory right to counsel in TDFPS-filed parental termination cases. Tex. Fam. Code Ann. § 107.013(a) (West Supp. 2017). That right to counsel includes the right to effective assistance of counsel. *In re M.S.,* 115 S.W.3d 534, 544 (Tex. 2003). To satisfy his burden of proving that his trial counsel was ineffective, Father must show (1) that she failed to perform in a reasonably effective manner and (2) that "the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *In re H.R.M.,* 209 S.W.3d 105, 111 (Tex. 2006) (internal quotation marks and citation omitted); *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Father cannot meet his burden.

First, the record contains no indication that Father wanted a jury trial and no objection to the bench trial. We therefore cannot conclude that his trial

26

counsel was ineffective for not requesting a jury trial. *See In re K.M.H.*, 181 S.W.3d 1, 9, 16 (Tex. App.—Houston [14th Dist.] no pet.) (op. and supp. op. on reh'g).

Second, during the trial, Appellant's trial counsel vigorously cross-examined most of TDFPS's witnesses, offered Father's mother as a witness, offered exhibits into evidence, objected to other evidence, and delivered an appropriate closing argument focused on Father's recent progress and the twins' best interests. The record therefore contains no indication, and we cannot conclude, that Father's trial counsel was hampered by not engaging in formal discovery or that she did not adequately prepare for or perform in trial. *See, e.g.*, *In re J.P.B.*, 180 S.W.3d 570, 574–75 (Tex. 2005).

Third, Father focuses on the proposition that with more time from a continuance or extension, he could have completed his services. Yet, by the time the trial concluded, he had had thirteen months to complete his services and had not done so. More to the point, he had continued to (1) minimize his responsibility for the twins' removal as well as his drug issues and (2) violate the trial court's order that he have no unsupervised contact with children under the age of sixteen. Whether the trial court would have granted a motion for continuance or a motion for extension given the opportunity is an open question, but taking the trial judge at her word, she would not have, decisions we would have reviewed only for an abuse of discretion. *See, e.g.*, *In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *8 (Tex. App.—Fort Worth Sept. 8, 2016, no

27

pet.) (mem. op.) ("Given Mother's ten-month delay in addressing her drug addiction and her failure to keep in contact with the Department, it was entirely within the trial court's discretion to determine that [she] had failed to present any extraordinary circumstances [supporting an extension]."); *In re K.P.*, No. 2-09-028-CV, 2009 WL 2462564, at *4 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.) ("[W]hen a parent, through his . . . own choices, fails to comply with a service plan and then at the time of the . . . trial requests a continuance or an extension of the . . . dismissal deadline . . . to complete the plan, the trial court does not abuse its discretion by denying the continuance or extension.").

Finally, Father cannot show a reasonable probability that the outcome of the trial would have been different even if his trial counsel had requested and the trial court had granted a continuance, an extension, or both. *See M.S.*, 115 S.W.3d at 550. A continuance or extension would not have reduced the evidence supporting the endangerment and best-interest findings unchallenged by Father on appeal, especially the damning evidence that Father endangered the twins by supplying Mother with methamphetamine when he knew she was pregnant and that he continued to endanger them and subject them to a life of instability by using drugs during the pendency of the case. We therefore overrule his second issue.

### III.    CONCLUSION

Having overruled both of Father's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  PITTMAN, J.; SUDDERTH, C.J.; and BIRDWELL, J.

DELIVERED:  May 3, 2018