

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00133-CV

_____

IN THE INTEREST OF I.P., M.G., P.P., AND T.P., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-679833-20

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant I.P. (Mother) appeals (1) the termination of the parent–child relationship between her and three of her children—M.G. (Mary), P.P. (Peter), and T.P. (Tamara)—and (2) the appointment of the Department of Family and Protective Services as the permanent managing conservator of her fourth child—I.P. (Isaac).[1] Mother's appointed appellate counsel (Counsel) filed an *Anders* brief asserting that there are no arguable, nonfrivolous issues for appeal. After reviewing this *Anders* brief, considering Mother's pro se responses to it, and conducting an independent review of the record, we agree with Mother's counsel that there are no arguable grounds for appeal. We affirm.

## I.  Background

Mother's parental rights to Mary, Peter, and Tamara were terminated and the Department was appointed as Isaac's permanent managing conservator after a series of concerning events.

### A.    Removal

In October and November 2019—while Mother and the four children were living with Mother's then-boyfriend, S.S. (Husband)[2]—the Department received reports that the three oldest children—Isaac, Mary, and Peter—had been engaging in

---

[1]The trial court also terminated the parent–child relationship between Mary Peter, Tamara, and their respective fathers, but none of the fathers have appealed.

[2]Husband is not the biological father of any of the four children.

inappropriate sexual activities with one another and with other children in their home.[3] Mother blamed Mary and Isaac for the behavior, and she became increasingly "adamant that she wanted [Mary] and [Isaac] out of the home." Consequently, in December 2019, Mary and Isaac were removed with Mother's consent.[4]

That same month, both Mother and Husband tested positive for cocaine and marijuana.[5] When then-five-year-old Peter and then-six-month-old Tamara were tested for drugs, they too tested positive for cocaine and marijuana.[6] Mother later explained the children's positive drug tests by stating that the drugs were "in [her] pores" when she "d[id] their hair." Peter and Tamara were removed in January 2020.

## B.    Post-Removal Actions

Around the time Peter and Tamara were removed, Mother married Husband, who she later testified had not only joined in but actually encouraged her use of cocaine.[7]    At trial, Mother admitted that she had continued using cocaine and

---

[3]Mother, Husband, and the four children lived with Husband's sister and the sister's children.

[4]Mother signed an affidavit stating, "I no longer want [Mary and Isaac] in my home because they are touching [each other]."

[5]When confronted with her positive drug test, Mother admitted that she had used cocaine while all four children were still living with her.

[6]Tamara also tested positive for amphetamines and methamphetamines.

[7]Mother later testified that Husband had forced her to use cocaine through "peer pressure."

"smoking weed" through March 2020. Mother further testified that Husband had been violent towards her due to "[t]he drugs." Although Mother insisted that the violence had not started until after the four children had been removed, Peter confided in his foster father that he had regularly heard "screaming and fighting or tussling." Later, Mother moved into a domestic violence shelter.[8]

## C.    Service Plan

After the Department removed each of the four children from Mother's home, the trial court entered temporary orders requiring Mother to comply with the Department's service plan, and the plan specified conditions for the children to return to Mother's home. One of Mother's caseworkers testified that, when Mother moved into a faith-based living shelter in early 2021, she began participating in and ultimately "finished all of her services that [the Department] required of her."[9] By mid-2021, she "was doing such an excellent job" on her service plan that the Department decided not to seek termination of her parent–child relationship with Isaac—who was

---

[8]At the time of trial, Mother testified that she was working with legal aid to pursue a divorce from Husband.

[9]The caseworker elaborated, confirming that Mother "was going to MHMR regularly," she was "taking her medication," she "had passed all of her drug tests," she had completed the "therapy, parenting classes, the darkness to light class, [and] individual counseling," she had "submitted all of her certificates," and she was "on every Zoom call."

in a residential treatment facility at the time[10]—and the trial court instead appointed the Department as Isaac's permanent managing conservator, with Mother appointed as possessory conservator. *See* Tex. Fam. Code Ann. § 153.371. The Department also supported a monitored return of Mother's other three children.

**D.    Monitored Return**

The trial court ordered a monitored return of Mary beginning in June 2021, and it authorized Mother to have phased-in unsupervised visitation with Peter and Tamara before they were placed with her on monitored return in July 2021. *See id.* § 263.403.

In mid-June, while Mary was living with Mother on monitored return at the faith-based living shelter, Mother reported that she and Mary had been kidnapped. Mother initially told the Department that Husband had confronted her and Mary at a restaurant, that he had kidnapped them at gunpoint, that he had taken them to a hotel, that he had physically and sexually assaulted Mother, and that she had escaped the next morning and called the police. She later admitted that this tale was a lie.[11] In actuality, Mother had voluntarily arranged for her and Mary to go on an outing with Husband, and Mother then felt "peer pressure[d]" into joining Husband at his hotel. Although she called the police from the hotel lobby at one point, she subsequently

---

[10]Mother's caseworker testified that, "[d]ue to [Isaac's] acting out sexually, a part of the plea deal that was being made . . . on the criminal side, as well as with CPS, [was] that he would be placed in a residential treatment center."

[11]Mother also admitted that she had asked Mary to corroborate her lie.

returned to the room where she claimed that Husband hit her, choked her, and attempted to have sex with her while Mary was sleeping.[12]

After this incident, the trial court entered an emergency order removing Mary from Mother's custody, ending Mary's monitored return, and canceling the upcoming monitored return of Peter and Tamara. The Department recommended termination of the parent–child relationship between Mother and Mary, Peter, and Tamara.

**E.    Trial**

In January 2022, the trial court conducted a bench trial on the Department's petition to terminate.

Mother testified. She initially blamed the children's sexual behavior on "kids in the neighborhood," but later in her testimony, she related that Isaac had been exposed to porn at a young age and that Mary had told her that she had been inappropriately touched by Peter's father and by Husband's sister's children. Peter also confided in his foster father that he had been inappropriately touched by "his other dad."

Mother admitted to her former drug use, and she admitted that several of her live-in romantic partners—including Husband and Mary's and Peter's biological fathers—had been abusive.[13] Mother was still living at the faith-based shelter at the

---

[12]The police returned the following morning, and they arrested Husband and took Mother to the hospital.

[13]Mother insisted that, in each instance, the children were "[n]owhere near around" when the violence occurred.

time of trial, and she confirmed that she intended to stay there "as long as they w[ould] allow" and that her children could join her there. According to Mother, she was no longer taking drugs, she had held a job since July 2020, and she had completed numerous life-skills, parenting, counseling, domestic violence, and addiction-related programs.

## F. Judgment

The trial court found that termination was in the three youngest children's best interest and that Mother had endangered these three children by her conduct and by their environment. *See id.* § 161.001(b)(1)(D), (b)(1)(E), (b)(2). Based on these findings, the court terminated Mother's parental rights to Mary, Peter, and Tamara.

## II. Discussion

Counsel filed an *Anders* brief indicating that Mother's appeal is frivolous. *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth, order) (holding *Anders* procedures apply to parental termination appeals), *disp. on merits*, 2-01-349-CV, 2003 WL 2006583, at *1–3 (Tex. App.—Fort Worth May 1, 2003, no pet.) (per curiam) (mem. op.). He stated that "after thorough examination of the transcript and statement of facts, [he] can find no errors warranting reversal that can be legitimately supported by the record." Counsel informed Mother of her right to file a pro se response to the *Anders*

7

brief,[14] *see Anders*, 386 U.S. at 744, 87 S. Ct. at 1400, and Mother did so, filing two separate responses.

But Mother's responses do not identify any arguable grounds for appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 826–27 (Tex. Crim. App. 2005) (explaining that, in *Anders* review, the court of appeals "has two choices": it may either determine that arguable grounds for appeal exist and remand the case for new counsel or explain that it finds no arguable grounds for appeal). All of the issues Mother raises rely upon facts and assertions outside of the record—she references documents that she believes could have supported her case at trial, she refutes portions of the reporter's record with her own description of events, and she argues that she has recently improved her lifestyle. Even if these issues were thoroughly briefed by new counsel, *see id.* at 827 (noting that, in *Anders* review, the court of appeals should not address the merits of arguable issues raised in a pro se response until "after the issues have been briefed by new counsel"), they could not be meritorious because our review is confined to the record. *See In re M.S.*, 115 S.W.3d 534, 546 (Tex. 2003) (stating that "this Court—or any appellate court—may only consider the record presented to it, and we cannot speculate on what might or might not be in the missing portions of the record"); *In re O.H.*, No. 02-21-00159-CV, 2021 WL 4228607, at *2–3 (Tex. App.—

---

[14]Counsel also informed Mother of her right to request the appellate record, provided Mother with a motion for pro se access to the appellate record, and informed her of this court's mailing address. *See Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014).

Fort Worth Sept. 16, 2021, no pet.) (mem. op.) (reiterating that "[a]n appellate court may not consider matters outside the appellate record" when appellant in restricted appeal filed new affidavit attempting to show the involuntariness of relinquishment affidavit (quoting *In re B.H.*, No. 02-15-00155-CV, 2015 WL 5893626, at *4 (Tex. App.—Fort Worth Oct. 8, 2015, no pet.) (mem. op.))). Mother's issues thus lack arguable merit. *Cf. Garner v. State*, 300 S.W.3d 763, 764–67 (Tex. Crim. App. 2009) (clarifying that, in *Anders* review, a court of appeals "may explain why the issues have no arguable merit," and holding that lower court's discussion of ten points raised in pro se response to *Anders* "benefitted the appellant by providing him with additional detail as to why the grounds [we]re not meritorious").

Although Mother identifies no nonfrivolous issues in response to Counsel's *Anders* brief, we nonetheless independently review Counsel's brief to ensure that it reflects the conscientious evaluation of the record required under *Anders*, and we must independently examine the record to determine if any arguable, nonfrivolous grounds for appeal exist. *See In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pet. denied). Having completed both tasks, we conclude that Counsel's brief meets the *Anders* requirements and that no arguable, nonfrivolous grounds for appeal exist. *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *see also In re M.G.*, No. 02-21-00149-CV, 2021 WL 4319708, at *1–2 (Tex. App.—Fort Worth Sept. 23, 2021, no pet.) (mem. op.) (conducting similar *Anders* analysis and reaching similar conclusion); *In re W.J.*,

9

No. 02-20-00275-CV, 2021 WL 62132, at *1–2 (Tex. App.—Fort Worth Jan. 7, 2021, no pet.) (mem. op.) (similar).

### III. Conclusion

We affirm the trial court's order terminating the parent–child relationship between Mother and Mary, Peter, and Tamara, and we affirm its appointment of the Department as permanent managing conservator of Isaac.[15]

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: September 22, 2022

---

[15]Although Counsel filed a motion to withdraw based on his conclusion that Mother's appeal is frivolous, Counsel remains appointed through proceedings in the Texas Supreme Court unless he is relieved of his duties for good cause. *In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016) (order).