**Reversed and Remanded and Majority and Dissenting Opinions filed July 11, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-24-00055-CV

---

## IN THE INTEREST OF I.S. AND X.S. A/K/A X.R., CHILDREN

---

**On Appeal from the 507th District Court
Harris County, Texas
Trial Court Cause No. 2022-32359**

---

## M A J O R I T Y   O P I N I O N

The trial court signed a final decree of termination on January 12, 2024, terminating Mother's parental rights with respect to her ten-year-old son, I.S. ("Isaac"), and her two-year-old son, X.S. a/k/a X.R. ("Xander").[1]  Mother appeals the order and raises seven issues, challenging the manner in which trial was conducted and the sufficiency of the evidence supporting the jury's findings. Because we conclude that Mother was denied procedural due process in the

---

[1] We refer to the children using pseudonyms.  *See* Tex. Fam. Code Ann. § 109.002(d).

underlying proceedings and was harmed by that denial, we reverse the trial court's final decree and remand the case for further proceedings.

## BACKGROUND

On May 28, 2022, Mother was suffering from a mental health crisis and called 911. Mother was transported to the psychiatric unit at Ben Taub hospital in Houston. According to Mother, she underwent a 12-hour psychiatric evaluation before she was released. Isaac and Xander were placed in foster care while Mother was hospitalized.

Three days later, the Department filed an "Original Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." The Department sought termination of Mother's parental rights with respect to Isaac and Xander. The Department included with its original petition an affidavit from Department caseworker Jerteria Harper, which discussed Mother's mental health crisis and her subsequent admission to Ben Taub. In its conclusion, the affidavit states:

> Due to concerns of [Mother's] lack of mental health compliance and past mental health incidents the [Department] is requesting to be named Temporary Managing Conservator of [Isaac and Xander]. The Department believes that placing [Isaac and Xander] back into [Mother's] care would be contrary to [their] well-being and safety due to [Mother's] underlying mental health issues.

The trial court signed emergency orders appointing the Department as Isaac's and Xander's temporary sole managing conservator.

The parties proceeded to a jury trial in November 2023. Seven parties participated in the trial: the Department, Mother, Isaac's Father ("Jed"), Isaac's paternal grandmother ("Grandmother"), Xander's father ("Omar"), Xander's attorney ad litem, and the State's Attorney General. At the pre-trial conference, the

2

trial court informed the parties that the three days allocated for trial "gets divided by y'all" with each party receiving "about three and a half hours total."

The jury heard testimony from 12 witnesses. In sum, the witnesses' testimony focused on the following points to show that Mother was unable to effectively parent Isaac and Xander:

- Mother's mental health (including the May 2022 incident that resulted in her hospitalization in Ben Taub's psychiatric unit): Mother testified that she previously had been diagnosed with anxiety, depression, bipolar disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. Mother said she currently was on several medications, including Adderall, Aripiprazole, and Diazepam. Mother testified that she takes her medications regularly and has been in therapy. Several witnesses testified that Mother had a proclivity for calling 911 and once called 911 approximately 26 times in a single day.

- The events surrounding the birth of Mother's fifth child, Nadine:[2] Nadine's birth was difficult because, according to Mother, she did not want to undergo a c-section and instead chose to "get a natural birth with a midwife." Mother returned to the hospital at 44 weeks pregnant, when she was in the early stages of labor and her midwife "was an hour away." Nadine was born without any amniotic fluid but was not expected to suffer any long-term consequences.

  Two days after Nadine's birth, Mother returned to the hospital and attempted to take Nadine home. Hospital police followed Mother to her vehicle, where she had placed Nadine in a car seat. The hospital police prevented Mother from leaving the premises.

- A prior domestic abuse incident: Mother said she broke up with her ex-boyfriend after the incident.

During the witnesses' testimony, the trial court repeatedly enforced a 3.25-hour time limit for each party. From each party's allotted time, the trial court deducted not only time spent on direct examination but also time spent cross-examining witnesses

---

[2] Nadine is not a party to the underlying proceedings.

3

and lodging objections. Mother's counsel repeatedly objected to the time limit and requested more time to put on Mother's case.

The trial court permitted Mother's counsel to make an offer of proof with respect to three witnesses she could not question since she had run out of her allotted time. The trial court subsequently gave Mother's counsel an additional 15 minutes for each of the three witnesses. After the jury heard testimony from these witnesses as well as two additional witnesses, the parties rested. Mother's counsel again objected that she did not have enough time to put on Mother's case.

The jury retired to deliberate and the charge asked the jury whether Mother's parental rights with respect to Isaac and Xander should be terminated under three predicate grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (endangerment by environment), (E) (endangerment by conduct), (O) (failure to comply with family-based safety services plan). The jury found that Mother's parental rights should be terminated on all three grounds with respect to both Isaac and Xander; the jury also found that termination of Mother's parental rights was in the boys' best interests. The jury found that (1) Grandmother should be named as Isaac's sole managing conservator, (2) Jed should be named as Isaac's possessory conservator, and (3) Omar should be named as Xander's sole managing conservator.

The trial court signed a final decree on January 12, 2024, incorporating the jury's findings and terminating Mother's parental rights with respect to Isaac and Xander. Mother timely appealed.

### ANALYSIS

Mother raises the following seven issues on appeal:

1. Mother's procedural due process rights were violated by the trial court's imposition of time limits;

2. the evidence is insufficient to support termination under Texas Family

4

Code section 161.001(b)(1)(D) (endangerment by environment) and (E) (endangerment by conduct);

3. the evidence is insufficient to support termination under Texas Family Code section 161.001(b)(1)(O) (failure to comply with a family-based safety services plan);

4. the evidence is insufficient to show that termination of Mother's parental rights is in Isaac's and Xander's best interests;

5. the trial court committed error by excluding certain evidence;

6. the evidence is insufficient to support the conservatorship appointments; and

7. the relief granted in the final decree constitutes an abuse of discretion.

Because we sustain Mother's first issue, we need not address the other issues she raises on appeal.

## I.    Mother's Procedural Due Process Rights

In her first issue, Mother contends that she was denied procedural due process of law. *See* U.S. Const. amend. XIV, § 1 (providing that no State shall "deprive any person of life, liberty, or property without due process of law); Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land.").[3]  Specifically, Mother asserts that the trial court's timekeeping decisions prevented her from fully presenting her case and inhibited her ability to effectively cross-examine the witnesses.

### A.    Governing Law

To analyze a claim alleging the deprivation of procedural due process, we apply a two-part test:  (1) whether the complaining party has a liberty or property

---

[3] The Supreme Court of Texas has found no meaningful distinction between Texas's due-course-of-law protection and the federal constitution's due process guarantee. *See Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

interest entitled to protection, and (2) if so, what process is due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). "[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971); *see also In re J.R.*, 652 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (stating "[d]ue process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner").

Parents have a fundamental liberty interest "in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) ("One of the most fundamental liberty interests recognized is the interest of parents in the care, custody, and control of their children."). This fundamental liberty interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky*, 455 U.S. at 753.

The constitutional process due in a given situation is measured by a flexible standard that depends on the circumstances' practical requirements. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *see also, e.g.*, *In re N.G.*, 577 S.W.3d at 236-37. *Eldridge* directs courts to balance three factors to determine what procedural safeguards are required: (1) the private interest affected by the proceeding or official action, (2) the countervailing governmental interest supporting use of the challenged proceeding, and (3) the risk of an erroneous deprivation of the private interest due to the procedures used. *Eldridge*, 424 U.S. at 335. Courts must weigh these factors to determine whether the fundamental requirements of due process have been met by affording an "'opportunity to be heard' at a meaningful time and in a meaningful

manner" under the circumstances of the case. *See City of L.A. v. David*, 538 U.S. 715, 717 (2003) (per curiam) (quoting *Eldridge*, 424 U.S. at 333).

## B. Preservation

On appeal, the State asserts that Mother did not preserve her procedural due process complaint. We disagree.

Texas Rule of Appellate Procedure 33.1 requires that a party present its complaint to the trial court in a manner that states "the grounds for the ruling . . . with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds [are] apparent from the context." Tex. R. App. P. 33.1(a)(1). Courts, including this one, have held that a party must present due process arguments to the trial court in order to pursue them on appeal. *See, e.g.*, *In re L.M.I.*, 119 S.W.3d 707, 710-11 (Tex. 2003); *Lee v. City of Houston*, No. 14-05-00366-CV, 2006 WL 2254401, at *3 (Tex. App.—Houston [14th Dist.] Aug. 8, 2006, pet. denied) (mem. op.).

The first mention of time limits came during the parties' pre-trial conference, during which the trial court had the following exchange with the attorneys:

| | |
|---|---|
| **Trial Court**: | And I'm going to split the time of the jury, and so I'll be having — how many — how many clocks going on? And — yeah. And so somehow I get to — when you — if you're objecting or whatever, that's okay. Feel free to object and feel free to talk all you want, but it's going to count on your time. So I'll take the time that we have left over, divide it by all of y'all and say, "you have x-number of hours," and I will put it on timers. |
| **Mother's Counsel**: | Are you talking about for voir dire only? |
| **Attorney Ad Litem**: | So what's the total? |

7

| | |
|---|---|
| **Mother's Counsel**: | Is that what you're talking about? |
| **Trial Court**: | The voir dire — you get to be timed on the voir dire, and then the remaining time of the three days gets divided by y'all. And I'll do timers for those days, too. |

*        *        *

| | |
|---|---|
| **Trial Court**: | Hang on. Let me see. Where's my calculator? How many attorneys do I have? |
| **Omar's Counsel**: | Five, Your Honor. |
| **Trial Judge**: | You each get about three and a half hours total. |
| **Omar's Counsel**: | Three and a half hours? |
| **Trial Judge**: | Total. That's not counting Tuesday. If y'all have — if y'all narrow down your voir dire, you may have a little bit more time that afternoon. But other than that, each one seems to have about three and a half hours. That's without breaks. |

Before the parties began their opening statements, the trial court stated that "whatever time" each party took for their opening statement would be deducted from "your three hours and 15 minutes."

The State began presenting its witnesses, starting with Mother. After Mother's testimony, the trial court recapped everyone's remaining time; Mother had "two hours, 45 minutes and 51 seconds" remaining. The trial court again recapped everyone's remaining time after the State examined its second witness, telling Mother she had "two hours, 20 minutes and 44 seconds" remaining.

On the second day of trial, the State was examining its seventh witness when the trial court recapped the parties' remaining time. After stating that Mother had "42 minutes and 49 seconds remaining," Mother's counsel had the following

8

exchange with the trial judge:

| | |
|---|---|
| **Mother's Counsel**: | And, Judge, just for the record, we haven't put on our case. |
| **Trial Court**: | You have 45 minutes to put it on, ma'am. So it's entirely up to you. |
| **Mother's Counsel**: | We would like to let the Court know that we don't believe we can do it in that short of time. |
| **Trial Court**: | Well, ma'am — |
| **Mother's Counsel**: | If there's any way, we can get more time, we would request it at this time. |
| **Trial Court**: | The court doesn't have any more time. Y'all announced that that was the time that was required by all of y'all. The Court allocated the time accordingly. If y'all recall at the very beginning, even back when we did the pretrial, this is what — hang on, Ms. Young. This is what y'all told me. |
| | And I said, okay, this is the hours in the day. As a matter of fact, I've added an extra hour by releasing the jury an hour later yesterday, okay, to be able to allocate enough time for all of y'all. Mr. Jones [counsel for the State Attorney General] is not using his time, only a few minutes here and there. So that's how it's being allotted amongst everyone with the same amount of time. |
| **Mother's Counsel**: | I'm sorry, Judge. |
| **Trial Court**: | It was three hours and 15 minutes per side. That's what it was allotted for everyone. |
| **Mother's Counsel**: | Yeah. I understand, Judge, that that was the time that the Court gave us. I didn't realize that that was the time that we were agreeing to. |
| **Trial Court**: | That's what y'all agreed to. |
| **Mother's Counsel**: | And my understanding is that that's the time the Court gave us, not that we could just do it in three hours. |

9

| | |
|---|---|
| **Trial Court**: | No, ma'am. Y'all said, I can try this case in four days including the jury. And this is four days including the jury. And the Court allocated that time. |
| **Mother's Counsel**: | Well, we just object to not having enough time to put on our case. |
| **Trial Court**: | Okay. Ms. Young, your objected is noted. Y'all agreed to this. And the Court is moving forward with this. And I've been giving y'all the time throughout the entire time. |

At the conclusion of the second day's proceedings, the trial court gave each party their remaining time; Mother had "24 minutes" remaining.

At the beginning of the third day of trial, Mother's counsel asked for additional time to present Mother's case-in-chief. Denying the request, the trial court reasoned that the parties could not extend beyond the original time projected for trial because "that's my vacation time." Mother's counsel stated that she was under the impression that three hours were allocated for her case-in-chief and that she did not know that any objections also would count against it. The trial court gave Mother an additional 15 minutes to present her case-in-chief.

During counsel's direct examination of Mother, the trial court ended the questioning and stated "[h]er time is up." Counsel for Jed proceeded to present his case-in-chief. Jed presented testimony from two witnesses; when Mother's counsel tried to cross-examine the witnesses, the trial court told her she was out of time. After Jed rested his case, Mother's counsel and the trial court had another exchange regarding the time limits. Mother's counsel told the trial court:

> I thought I was getting three hours to put on my case in chief. To say that it was an agreement, that's not something that I could have ever agreed to knowing there's five lawyers, and all of these people get to object. We don't know. It's impossible to comply with something that you don't know with what is going to happen. I do know, though, that her right as a parent is in jeopardy. And for me not to be able to put on

10

her entire case is prejudicial to her. It violates ADA. ***It's unconstitutional***. ***It violates her due process rights***.

(emphasis added).

The trial court permitted Mother's counsel to make an offer of proof with respect to three witnesses she could not question since she had run out of her allotted time. After the offer of proof, the trial court subsequently gave Mother's counsel an additional 15 minutes for each of three witnesses: Mother, Grandmother, and Jed.

At the conclusion of trial, Mother's counsel again asserted an objection to the trial court's time limits. Acknowledging the objection, the trial court stated that Mother "ran out of time . . . I don't know, gazillions of years ago."

We conclude that this chain of events is sufficient to inform the trial court of Mother's objection, namely, that the imposed time limit violated Mother's procedural due process rights. *See* Tex. R. App. P. 33.1(a)(1). Mother's counsel timely and specifically objected to the trial court's deduction of time spent on objections and cross-examinations when the nature and extent of those deductions became clear. Mother's counsel reasserted this objection when the time limit prevented her from presenting her case as she saw fit, specifically stating that the limit was "unconstitutional" and violated Mother's "due process rights." These objections were sufficient to inform the trial court of the specific grounds for Mother's complaint. *See id*.

Arguing that Mother waived her due-process complaint, the State cites *In re Harrison*, 557 S.W.3d 99 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). While *Marriage of Harrison* examined and approved a trial court's imposition of time limitations, it is readily distinguished. First, the appellant there was unable to identify any part of the record "where she objected to the trial court's imposition of time limits." *See id*. at 127. Second, we examined the trial court's time limitation

11

with respect to the trial court's "authority to control the presentation of evidence" — not as a procedural due process complaint. *See id*. (citing Tex. R. Evid. 611(a)). Third, *Marriage of Harrison* did not involve a parental termination and did not involve the State seeking to sever a parent's fundamental constitutional right to parent their child. *See Santosky*, 455 U.S. at 759; *see also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (recognizing parental rights as "essential," "a basic civil right of man," and "far more precious than property rights") (internal quotations omitted). Given these differences, *Marriage of Harrison* does not compel the conclusion that Mother waived her due process complaint.

## C. Error

Turning to the substantive issue on appeal, we apply the *Eldridge* factors to determine whether Mother's procedural due process rights were violated.

### *Private Interests Affected by the Proceeding*

Parental rights are "far more precious than any property right" and, when the State initiates a termination proceeding, "it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759. Thus, a parent's interest in maintaining custody of and raising his or her child is paramount. *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). For this reason, a parent's interest in the accuracy and justice of the decision to terminate his or her parental status is a commanding one. *Id*. The private interests of the child also must be considered as "[b]oth the parent and the child have a substantial interest in the accuracy and justice of a decision." *Id*.

The private interests involved in this case — namely, Mother's fundamental liberty interest in maintaining custody and control of Isaac and Xander, the risk of permanent loss of the parent-child relationships between them, and Mother's,

Isaac's, and Xander's interests in a just and accurate decision — weigh heavily in favor of finding Mother was denied adequate constitutional safeguards via arbitrary time limitations imposed in an arbitrary manner. *See Santosky*, 455 U.S. at 759; *In re M.S.*, 115 S.W.3d at 547; *cf.* Tex. R. Civ. P. 1 ("The proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law.").

***The State's Interest in the Challenged Proceeding***

The State's interest in the proceeding includes protecting the best interest of the child, an interest which is "served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home." *In re M.S.*, 115 S.W.3d at 548-49; *see also In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) (noting that the State's "*parens patriae* interest in promoting the welfare of the child" aligns with the parent's interest in a just and accurate decision). The State also has an interest in an accelerated timetable and a final decision that is not "unduly prolonged" with negative psychological effects on the children left in limbo. *See In re M.S.*, 115 S.W.3d at 548; *see also In re B.L.D.*, 113 S.W.3d at 353. As has been recognized,

> [the] Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest. *See, e.g.*, Tex. Fam. Code Ann. §§ 51.11(b); 153.001; 153.002; 161.001(2); 161.101. And, like their parents, children have an interest in an accurate resolution and just decision in termination cases. But children also have a strong interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged.

*In re J.F.C.*, 96 S.W.3d 256, 304 (Tex. 2002) (Schneider, J., dissenting).

Here, although the trial court's time limitations may have served the State's interest in an accelerated timetable and a decision that was not "unduly prolonged," the record does not indicate that the limitations served the most important

13

overarching interest: the accuracy of the jury's decision with respect to the termination of Mother's parental rights. *See In re M.S.*, 115 S.W.3d at 548-49. Seven parties participated in the trial: the Department, Mother, Jed, Omar, Grandmother, Xander's attorney ad litem, and the State's Attorney General. Although only Mother's parental rights were at risk of termination, all the parties were allotted the same amount of time for their representations. Therefore, Mother — who was defending against allegations that her parental rights with respect to Isaac and Xander should be terminated — had the same amount of time as Jed, who merely was seeking a conservatorship with respect to Isaac. This is not an equitable division of time with respect to the issues before the jury and we disagree with the trial court's finding that Mother agreed to the conditions it imposed.

Moreover, the record is not clear as to what inspired these strict time limits. The record does not show that the parties proactively sought them; instead, they were announced by the trial court during the pretrial conference. The only indication in the record as to the need for these time limits was the trial judge's reference to her upcoming vacation. Moreover, as laid out above, the trial court's implementation of the 3.25-hour time limit was not the model of clarity. The trial court initially informed the parties that they "each get about three and a half hours total." The trial court did not clearly state that the time limit would include, in addition to their cases-in-chief, their cross-examinations of other parties' witnesses and their evidentiary objections. Under the circumstances, this was a material condition that contributed to the erroneous deprivation of Mother's rights to due process and due course of law.

Finally, the trial court's repeated enforcement of these time limits over Mother's timely and specific objections prevented Mother's counsel from effectively presenting Mother's case. As discussed above, Mother's counsel was conducting her direct examination of Mother when the trial court ended the

14

questioning and stated "[h]er time is up." The trial court cited to the time limits to prevent Mother's counsel from cross-examining two witnesses offered during Jed's case-in-chief. Although Mother was permitted additional time to question three witnesses, the record shows she was not given enough time to elicit the evidence she referenced in her offers of proof.

Based on this record, Mother did not have a sufficient opportunity to present her case or to be heard by the factfinder in a meaningful manner. The record also does not show that giving Mother additional time for the presentation of her case would have greatly harmed the State's interest in an efficient and economic resolution of this matter or in protecting the children's best interests. Accordingly, this factor weighs in favor of the finding that the trial court deprived Mother of due process. *See Eldridge*, 424 U.S. at 335; *In re M.S.*, 115 S.W.3d at 548-49; *In re B.L.D.*, 113 S.W.3d at 353.

### Risk of Erroneous Deprivation of Parent-Child Relationship

The third *Eldridge* factor analyzes the risk of erroneously depriving Mother of her private interest via the procedures at issue. *Eldridge*, 424 U.S. at 335. The Supreme Court of Texas has concluded:

> The parent's, child's, and government's interest in a just and accurate decision dovetails with the third *Eldridge* factor — that of the risk of erroneous deprivation. Termination of parental rights is traumatic, permanent, and irrevocable. This fact has been pivotal for the United States Supreme Court. And it is to us. For this reason, any significant risk of erroneous deprivation is unacceptable.

*In re M.S.*, 115 S.W.3d at 549.

As our discussion of the record has shown, the trial court's arbitrary and unclear time limitations posed a significant risk of erroneously depriving Mother of her parental rights. This significant risk is further underscored by our harm analysis

15

below. This risk is "unacceptable." *Id*. Accordingly, this factor weighs in favor of finding the procedures utilized by the trial court did not comport with due process. *See Eldridge*, 424 U.S. at 335; *In re M.S.*, 115 S.W.3d at 549.

Balancing the *Eldridge* factors, we conclude Mother was denied a meaningful opportunity to participate in the proceedings and, therefore, was denied procedural due process. *See Eldridge*, 424 U.S. 335; *Boddie*, 401 U.S. at 377.

### D.  Harm

We now turn to whether the denial of Mother's procedural due process rights constituted harmful error. To obtain reversal of a judgment based on trial court error, an appellant must show that the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting her case to the appellate court. *See* Tex. R. App. P. 44.1(a); *see also, e.g.*, *In re D.W.*, 498 S.W.3d 100, 118 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by Texas Family Code section 161.001(b)(1), and (2) termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). The best-interest analysis is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631-32 (Tex. 2018). In determining whether the evidence is sufficient to prove that termination is in the child's best interest, courts may consider several non-exclusive factors including (1) the child's desires, (2) the child's present and future emotional and physical needs, (3) any present or future emotional and physical danger to the child, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist the individuals seeking custody to promote the child's best interest, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or

16

omissions which may indicate that the existing parent-child relationship is improper, and (9) any excuses for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

As stated above, the trial court halted counsel's questioning of Mother on direct examination because "[h]er time is up." The trial court permitted Mother's counsel to make an offer of proof with respect to the testimony she expected to elicit if she had additional time to question Mother. Mother's counsel stated:

> I would ask my client about the community supports that she has since, you know, most of her family doesn't live in this state, where the community supports were. I would go down the list of best interest for her to, you know, be able to present in an appropriate way, you know, the best interest standard, the desires, what she knows to be the desires of her children.

In response, the trial court stated: "Okay. We've already gone, the best interest. I'm not going to go down each one. What else besides best interest?" After the conclusion of the offer of proof, the trial court gave Mother's counsel an additional 15 minutes to question Mother.

During the additional 15 minutes allocated for Mother's testimony, Mother's counsel did not have the opportunity to address the best interest factors before the trial court ended her questioning. Specifically, and despite announcing her intention to "go down the list of best interests," Mother's counsel did not elicit testimony regarding (1) Isaac's and Xander's present and future emotional and physical needs, and whether Mother had met those needs and was capable of doing so in the future, (2) Mother's parental abilities with respect to Isaac and Xander, (3) Mother's plans for Isaac and Xander, including schooling and daycare arrangements, and (4) the stability of Mother's home for Isaac and Xander. *See id*. These factors regarding the children's current living arrangements and Mother's plans for their futures are

17

central to the best interest analysis. *See id.* Counsel's inability to elicit testimony on these points prevented Mother from properly presenting her case on appeal. *See* Tex. R. App. P. 44.1(a).

Moreover, the importance of this testimony is magnified when considered in conjunction with the evidence pertaining to Isaac's and Xander's other living arrangements. With respect to Isaac, the jury found that Grandmother should be named as sole managing conservator and Jed should be named as possessory conservator. Grandmother testified at trial and said, when she previously had been given custody of Isaac, she "returned him back into foster care" because she "was extremely disabled." Grandmother also represented herself *pro se* in the trial court proceedings and, at some points, seemed confused about the type of relief she was seeking with respect to Isaac. Although Grandmother expressed that Mother's parental rights should be terminated, she also testified that Isaac should "maintain contact" with Mother and that Mother should "continue to be in his life."

Jed testified at trial and said he recently completed a four-year prison sentence. Jed agreed that he has "a history of violent crime" including aggravated robbery, driving while intoxicated, criminal trespass, and unlawful possession of a firearm. Jed explained that he also had a history of "drinking and drugging" but that he had changed his behavior since leaving prison. Jed said he currently works in west Texas; his schedule is 21 days of work and seven days off, during which he can return to Houston. Jed said he did not want Mother's parental rights terminated and asked that she and he be appointed as Isaac's joint managing conservators.

With respect to Xander, the jury found that Omar should be named as sole managing conservator. Testifying at trial, Omar said he originally was approached by a Department caseworker in 2022 "about participating in the case." Omar said he told the caseworker he "would think about it" but did not get back to the

caseworker for "[s]ix months." Omar acknowledged it was a "mistake" to leave his child in the Department's care for six months. Omar acknowledged having two other children but said he did not provide any type of support for their care.

Against this backdrop, it would have benefited the jury to hear additional evidence regarding the care Mother had been providing Isaac and Xander and the care she planned to provide them in the future. This evidence would have permitted the jury to fully evaluate the living arrangements available to Isaac and Xander and determine which arrangements best served the boys' best interests. *See Holley*, 544 S.W.2d at 371-72. But due to the trial court's imposition of time limits, Mother's counsel was prevented from eliciting testimony on these points. This constitutes harmful error. *See* Tex. R. App. P. 44.1(a).

We sustain Mother's first issue on appeal and conclude she was denied procedural due process of law and due course of law in the underlying proceedings. Due to our disposition of this issue, we need not consider Mother's other issues on appeal.

CONCLUSION

We reverse the trial court's January 12, 2024 final decree with respect to the termination of Mother's parent-child relationships with Isaac and Xander and remand those issues to the trial court for further proceedings.

19

/s/    Meagan Hassan
Justice


Panel consists of Justices Jewell, Zimmerer, and Hassan (Jewell, J., dissenting).